835 F.2d 1000
 43 Ed. Law Rep. 901
 Helen CLEMENTS, Plaintiff-Appellant,
v.
The COUNTY OF NASSAU, Nassau County Community College, Sean
A. Fanelli, Albert E. Donor, Jr., John Q. Adams, Jr., Anne
Christian, Phyllis Pelikan, Anita Madden, Alma E. Harr, and
Dorothy Cooke, Defendants-Appellees.
 No. 372, Docket 87-7590.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 2, 1987.
Decided Dec. 23, 1987.
 
 Richard P. Broder, Broder, Newman & Bengels, P.C., Mineola, N.Y., for plaintiff-appellant.
 Patricia Mary Carroll, Deputy Co. Attorney, Nassau County, Mineola, N.Y. (Edward T. O'Brien, Co. Atty.), for defendants-appellees.
 Before KAUFMAN, MINER and DAVIS,* Circuit Judges.
 IRVING R. KAUFMAN, Circuit Judge:
 
 
 1
 Allegations of improper conduct levelled against teachers in our university systems call into play fundamental questions of fairness. At times, however, they threaten to strike at the heart of institutions of higher learning. As Robert Maynard Hutchins once cautioned, "Freedom of inquiry, freedom of discussion, and freedom of teaching--without these a university cannot exist." This is particularly true where the charges are aimed at the core of a teacher's authority, the student's grade. In such cases of academic dismissals, summary judgment, when properly employed, can serve the laudable function of protecting our crucibles of knowledge from the vagaries of the judicial system.
 
 
 2
 Helen Clements appeals from a grant of summary judgment issued by Judge Edward R. Korman of the Eastern District of New York on June 11, 1987. Her civil rights complaint, under 42 U.S.C. Sec. 1983 (1982), asserted that appellees' bad faith grading and evaluation of her clinical performance as a nursing student resulted in her inability to graduate. The gravamen of her complaint is that the defendants, motivated by personal animus and ill will, rather than a legitimate assessment of Clements's academic performance, acted in concert to force her out of the Nassau County Community College (hereafter "College") nursing program.
 
 
 3
 Clements's first cause of action alleged civil rights violations by the individual appellees for denial of due process and equal protection. Her second claim alleged that appellees Nassau County and the College violated her rights by authorizing or sanctioning the acts of the individual appellees and by failing to promulgate rules and regulations to prevent such occurrences. Her third, fourth, fifth and sixth claims raised tort and contract issues.
 
 
 4
 Clements's saga began in the spring of 1981 when, at the age of 51, she enrolled in the College's nursing program. This was not her first exposure to the health care field. From 1950 to 1955, she worked at various hospitals as a laboratory technician. Appellant left her last position to raise a family. Thereafter, she became active in health-related community organizations, particularly those devoted to screening risk groups for hypertension.
 
 
 5
 The College's two-year nursing program includes four semesters. Course grades are based on written tests and clinical evaluations. Unsatisfactory completion of either component results in failing. From the first day, students are taught certain "over-riding" guidelines which apply to all aspects of patient-care. These include protection of the patient from emotional and physical jeopardy and maintenance of cleanliness at all times.
 
 
 6
 Clements's first year proceeded smoothly, although not without incident. As one of her first-year instructors, Nancy Latterner, explained, "her past experiences caused her to think she knew more than she actually did." At times, this "know-it-all" attitude prevented her from accurately assessing a patient problem.
 
 
 7
 According to Clements, however, her awareness of health care issues caused "the instructors [to] resent ... [her] from the beginning." Specifically, she points to a class presentation by a nurse she had worked with on the Nassau County Hypertension Coordinating Council. The nurse apparently ended her presentation on blood-pressure screening by suggesting that interested students also speak to Clements.
 
 
 8
 Clements received good grades her first year. In addition, she apparently held her first-year teachers in positive regard. As late as February 1983, she wrote a letter to the College paper, The Vignette, defending one of them from charges of nepotism.
 
 
 9
 Clements's first serious problem arose in the fall of 1982, her second year, when she contaminated the newborn nursery. She was advised of her error and acknowledged it. Although the instructor could have failed her, she was allowed to continue the course. Then, in December 1982, Clements twice failed an evaluation of her clinical skills by instructor Norma Ercolano--again because she did not maintain cleanliness. By failing the clinical procedure, she automatically earned an "F" for the entire course.
 
 
 10
 Clements appealed her grade to Health Sciences Dean Dolores Saxton. Contrary to departmental policy which allows only two chances, Dean Saxton arranged a third opportunity for Clements to pass. A different instructor evaluated her performance. In addition to the test previously given, she was required to complete another clinical procedure. This time, Clements received a "B" for the course.
 
 
 11
 Appellant commenced the final course in the spring of 1983. Several days into the course, she failed to maintain cleanliness in preparing a sterile dressing. More importantly, she did not realize she had done so and thus did not correct her error. Professor L.T. Prussack noted in her "anecdotal record," a log kept by the teachers to track student performance, that appellant "displays a lack of understanding of aseptic technique." She was allowed to withdraw from the course with a "W" grade representing her withdrawal, instead of receiving a failing mark.
 
 
 12
 Clements did not contest the merits of this judgment. Rather, she disputed her instructor's recommendation that she take time off to hone her clinical skills and wait until the spring of 1984 to retake the course. Appellant appealed to Dean Saxton, who refused to intercede again on her behalf. The Dean told Clements that she had reviewed her file and noted "too many little things." Dean Saxton agreed with the teacher that appellant should wait nine months before repeating the course.
 
 
 13
 Clements then contacted Dr. Albert E. Donor, Vice-President for Academic Affairs of the College, in the summer of 1983. Dr. Donor interceded on her behalf. Appellant was allowed to enroll in September of 1983.
 
 
 14
 Dr. Donor, however, was not the only official Clements contacted that summer. At the time Clements failed the spring 1983 course she was attempting to delete two entries from her anecdotal record for that course. Both concerned procedures performed on patients without the instructor's permission. In June, she communicated these and other concerns to Dr. Irving Williams, President of the College. The school psychologist, Dr. Jack Dumas, also wrote to Dr. Williams on her behalf, requesting a hearing on the issue of the anecdotal records. She then wrote to the New York State Education Department and contacted her state senator. In her letters, Clements detailed what she perceived to be a "climate" of harassment. In addition to challenging the anecdotal records, she accused the College of delaying her grade change from an "F" to a "W" for two months and failing to forward her name to state authorities for the upcoming examination for licensed practical nurses.
 
 
 15
 On the second clinical day of the fall 1983 term, Clements again demonstrated unsafe clinical behavior. She failed to safeguard her patient while administering a soap suds enema to him. Although this procedure is part of the first-year curriculum, Clements acted as if she completely lacked knowledge of it. While appellant contends that she never endangered the patient's safety, she does not assert that she knew how to perform the procedure or that she did so correctly. Her instructor, Dorothy Cooke, failed her in the course. Because the nursing department allows only two opportunities to pass a course, this second failure precluded Clements from completing the nursing program.
 
 
 16
 According to Clements, her relationship with Cooke was doomed from the start. In an affidavit submitted to the district court on the motion for summary judgment, she described an incident occurring the first day of the clinical component which she believed indicated Cooke's predisposition against her. Responding to a question regarding the appropriateness of wearing a protective gown when checking the vital signs of a gangrenous patient, Clements insisted that a sign on the door indicating gowns were required applied even though the gangrene was limited to the patient's foot. When Cooke suggested she use common sense in such situations, Clements held fast to her view that the sign on the door was absolutely binding. It was at this point, Clements contends, that Cooke "berated" her.
 
 
 17
 On November 5, 1983, Clements initiated the College's four-step grievance procedure. In her letter, Clements did not contest the merits of her failure, but rather contended it was unfair to fail her within two days of the course's commencement. She also protested allegedly inaccurate anecdotal records.
 
 
 18
 Clements's appeal was denied in a timely fashion in each of the first three steps. The student first discussed the matter with the teacher, then met with the departmental chairperson, and, after that, came before the department's personnel and budget committee. Although she requested the final review in February of 1984, a hearing was not in fact convened until April 1985. It was conducted by an ad hoc subcommittee of the College's Academic Standing Committee, composed of five teachers drawn from various departments of the College plus student representatives.
 
 
 19
 The subcommittee found in Clements's favor, recommending that the nursing department allow her to repeat the final course. Its opinion concluded that,
 
 
 20
 1. As an ammature [sic] student Mrs. Clemments [sic] may have approached the relationship of student and teacher with a some-what non-conformist attitude which may have indicated without intent an attitude of superiority.
 
 
 21
 2. That the students [sic] grades are above average, indicating an ability to grasp the subject matter greater than a good percentage [sic] of her fellow classmates.
 
 
 22
 3. This student had a practical allied health education on a community level, which may have resulted in a serious misunderstanding of her actions, approach, desire, and which has been translated as an attitude of superiority on her part unacceptable to the faculty members involved in this situation.
 
 
 23
 4. That upon two occasions it appears she was treated with a rigid standard which may have been a result of a combination of her maturity, experience in the community which was not accommodated for by the faculty.
 
 
 24
 5. Ms. Clements was on two occasions given failing grades for the failure to perform to the faculty members [sic] satisfaction at a point in time so early in the semester it appears to be unreasonable. That it does not appear to us that the impropriety was so serious, life threatening, or dangerous that it should be the grounds to deny her a nursing degree.
 
 
 25
 6. Without concluding that it has occurred [sic] the above factors gives the appearance that this student may have been singled out, or used to make an example that inflexible rules must be met in the nursing profession and that no transgressions will be tolerated.
 
 One professor dissented, noting that:
 
 26
 The recommendations of the majority clearly is [sic] contrary to the long established rules of the Department of Nursing. These rules, which allow two attempts of a single course, are established for good reasons, which can not and should not be questioned. Since this student has not, after two attempts, been successful in completing proceedures [sic] to the satisfaction of the Nursing Department the faculty has the ultimate responsibility to decide the fitness of the student to enter a career based upon a degree awarded by this institution....
 
 
 27
 College rules, however, specifically vest final authority for grades with the faculty. The nursing instructor refused to change her grade. Appellant then commenced this action on August 26, 1985.
 
 
 28
 On November 4, 1985, appellees moved, pursuant to Federal Rule of Civil Procedure 12(b), to dismiss Clements's complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief could be granted. On March 24, 1986, the district court dismissed the charge against the College and the county, but refused to dismiss the claim against the individuals. In April 1986, Clements petitioned successfully for reargument. Appellees then moved for summary judgment. In October 1986, the lower court notified the parties to submit material pertinent to the summary judgment motion. Affidavits were provided as well as course outlines and Clements's official record. On June 11, 1987, Judge Korman granted the summary judgment motion and dismissed the pendent state claims for lack of subject matter jurisdiction. Clements now appeals that decision. We, therefore, set forth some elementary principles on the issues raised.
 
 
 29
 Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law." The burden falls on the moving party to demonstrate that no material facts are in dispute. Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 57 (2d Cir.1987); Heyman v. Commerce & Industry Insurance Co., 524 F.2d 1317, 1320 (2d Cir.1975). Where the record could not lead a rational trier of facts to find for the non-moving party, there is then no "genuine issue for trial." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). See generally Childress, A New Era for Summary Judgments: Recent Shifts at the Supreme Court, 116 F.R.D. 183 (1987).
 
 
 30
 In cases involving academic dismissal, educational institutions have the right to receive summary judgment unless there is evidence from which a jury could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance. Ikpeazu v. University of Nebraska, 775 F.2d 250, 253 (8th Cir.1985) (per curiam). The legal standard in challenging an academic expulsion is necessarily a higher one than for disciplinary dismissals because, as the Court explained in refusing to require colleges to provide hearings, the determination is more subjective and evaluative than the factual questions present in most disciplinary decisions. Board of Curators of the University of Missouri v. Horowitz, 435 U.S. 78, 90, 98 S.Ct. 948, 955, 55 L.Ed.2d 124 (1978). Recently, in Regents of the University of Michigan v. Ewing, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), the Court expanded upon this stance of judicial deference. When courts review the substance of academic decisions, it stated, they should show great respect for the teacher's professional judgment. Specifically, the Court held that courts may not overturn such decisions "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." Ewing, 474 U.S. at 225, 106 S.Ct. at 513.
 
 
 31
 In their motion, appellees presented evidence detailing appellant's troublesome history in the nursing program, noting particularly her inflexibility in judging problems and her inability to maintain cleanliness and protect patients. Clements, in her affidavit, never challenges the faculty members' poor evaluations of her performance. Neither does appellant contend she knew how to perform the procedures correctly. Rather, she characterizes her instructors' motives as hostile.
 
 
 32
 Clements's affidavit related her version of her second failure of the final course. Her conclusory statements, however, that she did not place the patient in physical and emotional jeopardy fail to provide a sufficient basis for a rational jury to decide that appellees' contrary view was a substantial departure from accepted academic norms.
 
 
 33
 Appellant contends that, because her claim turns on the animosity of the teachers, summary judgment is not warranted. This court has indeed held that summary judgment is usually unwarranted when state of mind is at issue. Wakefield v. Northern Telecom, Inc., 813 F.2d 535, 540 (2d Cir.1987) (citation omitted). The state of mind exception, however, is appropriate only where solid circumstantial evidence exists to prove plaintiff's case. In Wakefield, for example, evidence indicated the plaintiff had been dismissed in bad faith. This resulted in competing inferences which had to be resolved by a jury. Wakefield, 813 F.2d at 540-41.
 
 
 34
 No such circumstantial evidence has been presented here. Indeed, the evidence demonstrates that the College and its instructors made every effort to give Clements second--and even third--chances, most notably by allowing her to be evaluated by another teacher in the fall of 1982 and by not failing her for contaminating the newborn nursery. Clements simply failed to take advantage of the extra opportunities granted her. Throughout her time in the nursing program, she displayed an alarming tendency to repeat mistakes and exhibit rigidly counter-productive behavior. As the incident with Cooke the day before her final failure illustrates, her attitude grew more inflexible over time.
 
 
 35
 Appellant claims a material factual dispute exists over how many opportunities a nursing student has to pass a clinical testing procedure. She asserts that the school psychologist, Dr. Dumas, told students in his weekly "rap" sessions that they usually had three chances to pass a clinical test. Appellees reply that school policy allows only two chances. Although Dr. Dumas clearly lacked authority to make policy decisions for the department, this dispute is immaterial to the animus issue because Clements was in fact afforded three opportunities.
 
 
 36
 Appellant also states that the faculty "must have resented" her appeals to Dean Saxton, Vice President Donor, the College's president, and others. There is no indication of any such hostility in the record. On the contrary, the teachers consistently were sympathetic to her in resolving any doubt. Prussack, for example, did not attempt to dissuade her from retaking the final course. Rather, she suggested waiting until the spring of 1984 to allow Clements an opportunity to hone her clinical skills. Carol Schroeder, one of her teachers in the fall of 1982, could have failed her for contaminating the newborn nursery, but chose to allow her to continue. Moreover, if such evidence sufficed to survive summary judgment, all academic dismissals involving appeals to administration officials, however frivolous, would result in trials.
 
 
 37
 Clements points to Dean Saxton's decision to let another teacher review her clinical performance in the fall of 1982 as circumstantial evidence of her teacher's hostility against her. But Dean Saxton's action indicates a laudable desire to eliminate any perception of hostility rather than an admission that hostility existed. Also, the subcommittee's report refused to conclude, as appellant maintains, that she had been "singled out." Instead, the panel was concerned that her academic dismissal "gives the appearance she may have been singled out...." (emphasis added). These statements indicate the judicious manner with which the College handled Clements's case. They are not circumstantial evidence of bias.
 
 
 38
 Moreover, the College's four-step grievance procedure comports with minimal standards of due process. Although the fourteen-month delay between the third and fourth steps was perhaps ill-advised, appellant shares some of the blame for the delay because she was unavailable on the second scheduled meeting date. There is thus no material fact at issue.
 
 
 39
 We have recognized that, even in cases where state of mind is disputed, "the existence of undisputed facts can provide an adequate basis for rejecting a claim of improper motivation for a defendant's action." Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir.1985) (per curiam). Although caution must be exercised in making this determination, we are convinced that this case warrants it. The slight circumstantial evidence at best indicates that, at the time of the final failure in the fall of 1983, Clements's teachers were no longer willing to give her extra chances. It does not reveal any material fact in dispute from which a reasonable jury could conclude that her failing grade was such a substantial departure from accepted academic norms as to demonstrate that the teacher did not exercise professional judgment. Where, as here, the circumstantial evidence is so minimal and the legal standard of proof so daunting, summary judgment is appropriate even when state of mind is at issue.
 
 
 40
 Clements also claims a violation of equal protection because, when she retook her clinical evaluation in the fall of 1982 for the third time, she had to pass an extra procedure. Clements, however, fails to support her allegation that she was subjected to additional requirements. Rather, the third test was a special dispensation. Moreover, as a matter of law, we cannot say this action involved a substantial deviation from accepted procedures. For example, a medical school's refusal to allow a student a second chance on a failed exam did not violate equal protection although others had been allowed to retake it. Regents of the University of Michigan v. Ewing, 474 U.S. 214, 228 n. 14, 106 S.Ct. 507, 515 n. 14, 88 L.Ed.2d 523 (1985).
 
 
 41
 Finally, appellant's concerns that she was deprived of a liberty interest because of the appellees' entry of false, misleading and stigmatizing entries on her official record are without merit. The "anecdotal records" are not part of the official record; they are neither used for grading purposes nor disseminated. Appellant has failed to demonstrate a necessary element for her claim that appellees published or disseminated false defamatory information to the public. See, e.g., Cleveland Board of Education v. Loudermill, 470 U.S. 532, 547 n. 13, 105 S.Ct. 1487, 1496 n. 13, 84 L.Ed.2d 494 (1985). The district court thus rightfully entered summary judgment on this claim.
 
 CONCLUSION
 
 42
 In sum, the grant of summary judgment was appropriate. We affirm.
 
 
 
 *
 Honorable Oscar H. Davis, Circuit Judge, United States Court of Appeals for the Federal Circuit, sitting by designation