BANQUE de GESTION PRIVEE–SIB, Plaintiff,

v.

LA REPUBLICA de PARAGUAY and Banco Central Del Paraguay, Defendants.

No. 91 Civ. 7952 (MBM).

United States District Court, S.D. New York.

Feb. 24, 1992.

Michael Straus, David Dunn, Theodore M. Cooperstein, Davis, Markel & Edwards, New York City, for plaintiff.

Edwin J. Wesely, John F. Pritchard, Maurice W. Heller, Winthrop, Stimson, Putnam & Roberts, New York City, for defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff, a French bank, has sued the Republic of Paraguay and Banco Central del Paraguay, to enforce the terms of six loan agreements, all but one of which were guaranteed by the Central Bank. Plaintiff now moves for partial summary judgment pursuant to Rule 56(a) Fed.R.Civ.P., seeking judgment on Claims One and Four, which relate respectively to the Hospital Loan Agreement and the Alcohol Loan Agreement. For the reasons set forth below, plaintiff's motion is granted.

### I.

During the late 1970's and early 1980's, Paraguay substantially increased its foreign sovereign debt. Much of this debt is outstanding on loan agreements on which Paraguay is the obligor and/or Banco Central is the guarantor or obligor ("the LDC Debt"). (Def. Mem. at 4) Plaintiff sues upon six such loan agreements and related guarantees ("the Debt").

In 1987, Paraguay and Banco Central began defaulting on the LDC Debt and, by 1988, they had defaulted on the Debt. (Ortiz Aff. ¶ 2) The LDC Debt began to trade at a discount from its face value on the secondary market for the debt of lesser developed countries. (Def. Mem. at 5)

Sometime in late 1989 or early 1990, Paraguay instituted a program to repurchase, on a confidential basis, the LDC Debt on the secondary market. (Def. Mem. at 6, 7)

During the initial stages of this program, Finance Consult served as Paraguay's exclusive repurchasing agent. By July 1991, Finance Consult had been replaced. (Ortiz Aff. ¶ 15; Pritchard Aff. Ex. 1)

In August 1991, Michel Sperry, Finance Consult's principal, approached plaintiff with a plan to solicit holders of the Debt to assign their Debt to plaintiff. Various of these assignments were ultimately effected through three separate agreements: (1) a straight assignment in favor of plaintiff; (2) a promissory note and option agreement; and (3) a sharing agreement. Under the terms of the option agreements, plaintiff has a 90–day option period during which it can pay the dollar amount named on the relevant assignment agreement, or it can resell the Debt to the assignor for that same dollar amount. (Cizeron Dep. at 95–96)

The sharing agreements allocate potential costs and profits from recovery on the Debt. Typically, the agreements state that "BGP, assisted by Finance Consult, will undertake certain measures to attempt to recover payment on the assigned Debt." (Pritchard Aff. Ex. 4 at 1) The agreements then set forth BGP's authority "to initiate and conclude in its discretion any Action, Negotiation and/or Settlement that it deems necessary or desirable to recover all or part of the amounts owed by the Debtors in principal and interest related to the [Debt]." (*Id.* at 2)

## II.

Fed.R.Civ.P. 56(c) requires a summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S.

317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987). However, the mere existence of disputed factual issues is insufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The disputed issues of fact must be "material to the outcome of the litigation," *id.* 804 F.2d at 11, and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* With respect to materiality, "substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson* 477 U.S. at 248, 106 S.Ct. at 2510.

Summary judgment is "ordinarily inappropriate where an individual's intent and state of mind are implicated." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). However, "[t]he state of mind exception ... is appropriate only where solid circumstantial evidence exists to prove [defendants'] case." *Clements v. County of Nassau*, 835 F.2d 1000, 1005 (2d Cir.1987).

In response to plaintiff's motion for partial summary judgment, defendants do not question the merits of plaintiff's claim but raise the affirmative defense of champerty. Therefore, defendants must "show specific

facts warranting a trial" with respect to their champerty defense, *Consumers Union of United States, Inc. v. Campbell*, 1989 U.S. Dist. LEXIS 13634, at *8 (S.D.N.Y.1989); *see also Northwestern Nat'l Ins. Co. v. Alberts*, 769 F.Supp. 498, 511–12 (S.D.N.Y.1991), in order to defeat plaintiff's summary judgment motion.

■ In New York, champerty is defined and therefore limited by statute. *Sedgwick v. Stanton*, 14 N.Y. 289, 294–95 (1856). The New York champerty statute provides in relevant part:

> [N]o corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon....

N.Y. Judiciary Law § 489. The purpose of the statute is to prevent the unauthorized practice of law by corporations, *Knobel v. Estate of Eugene A. Hoffman Inc.*, 105 Misc.2d 333, 334, 432 N.Y.S.2d 66, 67 (S.Ct. 1980), and to "prevent the resulting strife, discord and harassment which could result from permitting ... corporations to purchase claims for the purpose of bringing actions thereon...." *Fairchild Hiller Corp. v. McDonnell Douglas Corp.*, 28 N.Y.2d 325, 329, 321 N.Y.S.2d 857, 270 N.E.2d 691 (1971). New York courts have interpreted § 489 narrowly, finding that "the assignment must be made for the very purpose of bringing suit and this implies an exclusion of any other purpose." *Id.; see also Concord Landscapers, Inc. v. Pincus*, 41 A.D.2d 759, 700, 341 N.Y.S.2d 538, 540 (1973).

Although both parties have proffered long and complex arguments,[1] as to why champerty does or does not void the Debt assignments, most of these arguments miss the mark. The only question at hand is whether plaintiff solicited the Debt for the sole purpose of bringing suit on it. For purposes of this motion, I assume *arguendo* that plaintiff acquired all the Debt pursuant to option and sharing agreements. Because I have concluded that these agreements are not champertous, it is unnecessary to address plaintiff's contention that certain pieces of the Debt were acquired through straight assignments without any accompanying option or sharing agreements (*see* Pl. Mem. at 25), or were acquired under other conditions negating defendants' champerty claim. (*See id.* at 20–25)

■ Defendants have offered three pieces of evidence in support of their claim that plaintiff acquired the Debt with the sole intention of suing on it. First, defendants argue that the option and sharing agreements "have the practical effect of giving BGP every incentive to move swiftly to sue defendants, to attach their assets and to obtain a judgment within the 90 day period allowed by the documentation." (Def. Mem. at 14) However, under § 489, an assignee's intent to sue is relevant only at the time of the assignment; whether an assignee subsequently forms an intent to sue in order to enforce rights under the assignment is irrelevant for purposes of § 489. In fact, New York courts have stated expressly that, "To constitute the offense the primary purpose of the purchase must be to enable him to bring a suit and the intent to bring suit must not be merely incidental and contingent." *Moses v. McDivitt*, 88 N.Y. 62, 65 (1882). Here, the shar-

---

1. Plaintiff even challenges the constitutionality of § 489, arguing that it unconstitutionally discriminates between "moneyed corporations" that are authorized to do business in New York and those that are not. "Moneyed Corporations" are defined as corporations to "which the banking law or the insurance law is made applicable by the provisions of such laws." N.Y. Genr'l Constr. L. § 66(9) (West Supp.1992). However, there is a rational basis for the New York legislature's requirement that moneyed corporations be licensed to do business in New York, and therefore regulated by New York banking and insurance laws, before enforcing otherwise champertous assignments in New York courts, because those assignments potentially lead to strife and harassment that can be more easily regulated in licensed than in unlicensed businesses.

ing agreements refer to plaintiff's right to initiate and conclude any negotiation or settlement on the Debt, as well as its right to initiate and conclude any action. (Pritchard Aff. Ex. 4 at 2) Moreover, the option agreements enable plaintiff to purchase the Debt outright within a 90–day period. Therefore, those agreements do not place plaintiff in the position of either suing on the Debt within the specified 90–day period, or retransferring it to the assignor. Consequently, neither the option nor the sharing agreements give rise to the inference that plaintiff acquired the Debt with the sole intention of suing on it.

■ Second, defendants claim that in the process of soliciting these assignments, Olivier Cizeron, a manager of plaintiff responsible for workouts and credit assessment, control, and management (Cizeron Dep. at 18–19), "made clear to the Assignors BGP's intent to bring suit against Paraguay and the Central Bank." (Def. Mem. at 15) However, the only support defendants have for this assertion is that Cizeron "admits that he informed [the Assignors] that BGP 'was ready, if necessary, to bring lawsuit' against Paraguay and the Central Bank in order to obtain payment." (*Id.* (quoting Cizeron Dep. at 134)) In fact, what Cizeron said was that he told the assignors "that he was expecting to receive payment on those notes but [he] was ready, if necessary, to bring lawsuit." However, even if Cizeron had not qualified his answer as he did, his statement that plaintiff was ready if necessary to sue is insufficient to establish champerty. This second argument too fails to create an inference of champerty because § 489 does not prohibit an assignee from forming an intent to sue if necessary to enforce rights acquired pursuant to the assignment. As stated above, the sharing agreements at hand authorize plaintiff to negotiate and/or settle as well as to initiate an action. Because contracts are construed to memorialize the intent of the parties at the time of contracting, *see, e.g.,* Corbin, *Corbin on Contracts* § 538 (1952), the express language of the sharing agreements shows that plaintiff intended to resort to suit only if necessary. Simply being "ready if necessary" to sue if negoti-

ations or settlement attempts failed, does not indicate that plaintiff's *sole* intent and purpose in acquiring the Debt was to bring suit. To the contrary, it demonstrates that plaintiff intended to sue only if forced to by defendants' refusal to settle its obligations. For over a century, New York courts have recognized that the law does not prohibit

> discounting or purchasing bonds and mortgages and notes, or other choses in action, either for investment or for profit, or for the protection of other interests, and such purchase is not made illegal by the existence of the intent ... at the time of the purchase, which must always exist in the case of such purchases, to bring suit upon them if necessary for their collection.

*Moses*, 88 N.Y. at 65. To find otherwise would permit defendants to create a champerty defense by refusing to honor their loan obligations. Section 489 does not compel such a perverse result.

■ Third, defendants claim that the course of events shows plaintiff "intended from the beginning to bring suit against defendants as soon as it collected a critical mass of assignments...." (*Id.*) Defendants would like me to infer from the fact that plaintiff sought an order of attachment two weeks after it had executed the first assignment, by which point it had amassed assignments totalling approximately $20 million, that plaintiff's sole intent in acquiring the Debt was to bring suit on it. However, as discussed above, the express language of the sharing agreements indicates that plaintiff's intent to sue was merely incidental to its intent, in defendants' own words, to "profit by 'acquiring' LDC Debt at a deep discount and attempting to recover one hundred cents on the dollar ..." (Def. Mem. at 16). Apparently, plaintiff intended to achieve this end in any of three ways—negotiating, settling, or suing—only one of which involved suing defendants. Defendants have offered no "solid circumstantial evidence," *Clements*, 835 F.2d at 1005, to call this conclusion into doubt.

The inference of champerty from the fact of this lawsuit is further attenuated by

plaintiff's sale of two pieces of the Debt. First, in September 1991, plaintiff began negotiations with Société Generale for the purchase of $3,021,548 face value worth of Hospital Agreement credits for 40% of face value. In October 1991, once plaintiff had an agreement in principal with Société Generale, plaintiff began negotiations with Credit Commercial de France ("CCF") for the sale of those Hospital Agreement credits. Plaintiff ultimately effected both transactions, earning a 7% profit that amounted to $290,000. (*See* Douin Aff. ¶¶ 18, 19) Second, on September 17, 1991, plaintiff agreed to purchase $3,579,905.32 face value worth of the Debt for 40% of face value from CCF; plaintiff and CCF entered an option agreement regarding this debt. In late September, CCF decided it did not wish to sell those pieces of debt. Plaintiff agreed to reverse the executory sales contract for 5% of the face value, earning $178,995,27 on this transaction. (*Id.* ¶¶ 22–23) Both of these transactions evidence plaintiff's profit motive with regard to the Debt. Defendants cannot argue that an inference of champerty arises from a course of conduct—plaintiff's acquisition of the Debt and subsequent litigation—and then exclude from its analysis the part of that same course of conduct that contradicts the inference: plaintiff's acquisition of and profit from a portion of the Debt without resort to litigation.

■ Defendants' only response to these transactions is that plaintiff acquired the first set of credits without a sharing agreement and that "there is convincing evidence concerning BGP's intent that points in the opposite direction [of a profit motive]." (Def. Rep. Mem. at 12) However, contrary to defendants' claim, the sharing agreements do not create an inference of champerty. Defendants appear to argue that the sharing agreements not only show that plaintiff's sole intention in soliciting the Debt was to sue on it, *see supra* pp. 6–7, but also that they prevent plaintiff from being the real party in interest with respect to the Debt. (Def. Mem. at 8–15, 24–27) However, plaintiff is the real party in interest under the sharing agreements because it is entitled to a percentage of profits on

the Debt, not simply a flat management fee. *Cf. Frank H. Zindle, Inc. v. Friedman's Express, Inc.,* 258 A.D. 636, 17 N.Y.S.2d 594 (1st Dep't 1940) (finding plaintiff was not real party in interest because "its only interest in the assignment was to bring a suit thereon and to earn a fee from the proceeds in the event that the prosecution of the suit was successful"). Second, plaintiff is the real party in interest because the sharing agreements give plaintiff complete discretion to initiate and conclude any negotiation, settlement, or action on the Debt. (Pritchard Aff. Ex. 4 at 2) In addition, the sharing agreements coexisted with the option agreements, which gave plaintiff the right to purchase the Debt within a 90–day period for the dollar amount named in the relevant assignment. Moreover, the New York Court of Appeals has found that a sharing agreement between private parties on a cause of action does not violate § 489. *See Fairchild Hiller,* 28 N.Y.2d at 330, 321 N.Y.S.2d 857, 270 N.E.2d 691.

Accordingly, plaintiff's motion for partial summary judgment is granted. Plaintiff is to settle a judgment as to Counts One and Four on ten days' notice.

SO ORDERED.