**PRAVIN BANKER ASSOCIATES, LTD., Plaintiff,**

**v.**

**BANCO POPULAR del PERU and The Republic of Peru, Defendants.**

No. 93 Civ. 0094 (RWS).

United States District Court, S.D. New York.

Aug. 24, 1995.

Winthrop, Stimson, Putnam & Roberts, New York City (John F. Pritchard, Valerie Fitch, of counsel), for plaintiff.

Baker & Hostetler, Washington, DC (Mark A. Cymrot, of counsel), for defendants.

## OPINION

SWEET, District Judge:

Plaintiff Pravin Banker Associates, Ltd. ("Pravin") has renewed its motion for summary judgment on its claims against defendants Banco Popular del Peru ("Banco Popular") and the Republic of Peru ("Peru") (Banco Popular and Peru are, collectively, the "Defendants") for dishonoring their respective obligations under (1) a letter agreement (the "Letter Agreement"), dated as of May 31, 1983, among Mellon Bank, N.A. ("Mellon"), Banco Popular and Peru, and (2) a Guaranty (the "Guaranty"), dated as of May 31, 1983, made by Peru in favor of Mellon. Pursuant to an Assignment Agreement, dated as of December 12, 1990, Mellon assigned

its right, title and interest in the Letter Agreement to Pravin.

Defendants have renewed their cross-motion for a stay or dismissal of the complaint. For the reasons set forth below, Defendants' motion will be denied, and Pravin's motion for summary judgment will be granted.

### The Parties

Plaintiff Pravin is a Delaware corporation having its principal place of business in New York, New York.

Defendant Banco Popular is a Peruvian State entity organized and incorporated under the laws of Peru and is a foreign state instrumentality as defined in 28 U.S.C. § 1603(b).

Defendant Peru is a foreign state as defined in 28 U.S.C. § 1603(a).

### Prior Proceedings

This action was commenced on January 7, 1993. By opinion and order dated February 24, 1994, *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru and The Republic of Peru*, 165 B.R. 379 (S.D.N.Y.1994) (*"Pravin I"*), Defendants were granted a stay of six months by way of an adjournment of Pravin's summary judgment motion. The facts and issues underlying this dispute are set forth in *Pravin I*, familiarity with which is assumed.

At the expiration of the six month adjournment, on October 24, 1994, the parties renewed and supplemented their motions. By opinion and order dated March 8, 1995, *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru and The Republic of Peru*, 1995 WL 102840 (S.D.N.Y.1995) (*"Pravin II"*), Defendants were granted a further stay of sixty days to enable the parties to submit responses to the following questions:

1. Has the bank Advisory Committee or Peru adopted a plan which would resolve the debts in the category held by Pravin?

2. Are there currently actions pending which present claims for debts in the category held by Pravin other than this action?

If so, how many and where are they pending?

3. Are there tolling agreements in effect for debts in the category held by Pravin? If so, how many?

4. Are there currently pending any actions seeking the relief sought by Pravin or any relief which could affect the Peruvian debt restructuring effort?

5. What is the amount of the Peruvian debt presently the subject of restructuring which remains unresolved?

The parties having submitted their responses, and the sixty day adjournment having expired, the motion and cross-motion were renewed and oral argument was heard on May 15, 1995. Pravin submitted further argument and factual allegations by way of a letter dated July 21, 1995, and the defendants submitted a response on August 8 and August 16, 1995. The motion and cross-motion were deemed fully submitted at that time. Although the arithmetical aggregate of the two stays amounts to eight months, the actual effect of the two stays and their related motion practice has been to delay the resolution of this question for almost eighteen months.

### Responses to the Court's Questions

In response to this Court's first question, Defendants submit that negotiations to resolve Peru's commercial debt problems are proceeding apace. During the week of February 6, 1995, Peru's Minister of Economy and Finance, Jorge Camet, held meetings in New York, London, Paris and Frankfurt with the majority of Peru's bank creditors. Additional meetings took place during the week of April 3, 1995, at the Inter–American Development Bank annual meeting in Jerusalem. Negotiations with the full Bank Advisory Committee (the "Bank Advisory Committee") [1] were held during the weeks of May 15, June 5, June 19, and July 10, 1995, "with the objective of reaching a definitive resolution of Peru's external commercial bank debt," and additional meetings are planned. Defendant's Letter of August 8, 1995, at 1. The

---

[1]. The Bank Advisory Committee is a committee consisting of Peru's major commercial lenders and chaired by Citibank, N.A. According to Defendants, "[t]o the extent practicable, the Bank Advisory Committee is representative of all Peru's commercial bank creditors. The Committee cannot bind any financial institution; it is merely advisory."

projected purpose of these negotiations has been to:

> negotiate a menu of options for commercial bank creditors of all categories to accept as an alternative to their current debt. Once an agreement is reached with the Bank Advisory Committee, these options will be offered to Peru's commercial bank creditors, including [Pravin], for their approval or rejection. The plan will go forward if sufficient commercial bank creditors accept the plan. The number of creditors needed to agree to the plan is also a matter of negotiations.

Supplemental Memorandum in Support of Defendants' Renewed Motion to Stay or Dismiss the Complaint at 3–4.

Pravin acknowledges that these negotiations are ongoing but maintains that no "plan" is forthcoming with respect to Peru's short-term working capital debt (the category of debt held by Pravin) and, in any event, that Pravin has not been notified of the ongoing negotiations and is not represented on the Bank Advisory Committee.

In the interim, there have been reports in the press that Peru is repurchasing its own foreign bank debt at a discount of 45 cents on the dollar. Peru is said to be acting through an intermediary Swiss bank to effect the repurchase. Plaintiff's letter of July 21, 1995. Defendants counter that Peru's negotiations regarding its commercial bank debt are by now well-advanced and that "substantial progress" has been made towards arranging refinancing of Peru's external bank debt. Defendants point out also that Peru's economy has made important strides towards soundness.[2] Defendants' Letter of August 8, 1995.

■ Pravin maintains that Peru has accorded disparate treatment to its creditors, conferring upon the Citibank syndicate a benefit not enjoyed by Pravin or other creditors, pointing to a July 12, 1995 presidential decree making the debt held by the Citibank syndicate eligible for use in Peruvian privatization transactions and to a subsequent waiver "permitting them to tender their debt to Peru in connection with privatization transactions." Plaintiff's Letter of July 21, 1995, at 4. Pravin interprets these actions to accord Citibank the opportunity to be a buyer in privatization, while withholding the opportunity from other creditors.

However, an examination of Peruvian law on external debt counters allegations of discrimination against Pravin and other creditors. As Defendants note, Peruvian Law No. 26520 makes all Peruvian external debt eligible for use in the privatization process as long as the debt is not subject to litigation and is owed by the republic. Where the debt is owed to a syndicate of banks, as in the case of the Citibank debt, that debt "enjoys the necessary waivers so that the use of part of the debt in privatization does not violate the 'sharing of payment' provisions of the applicable syndicated loan payment." Defendants' Letter of August 8, 1995, at 2. The actions taken in regard to the Citibank debt resulted from its status as held by a syndicate. Were Pravin to accept Peru's assumption of Pravin's debt, Pravin, like Citibank and all other debt-holders, would be permitted to use its debt to participate in the Peruvian privatization scheme.

Thus, since Peru indicates that the provisions of the privatization program afford Pravin the same opportunity as anyone else to trade debt for a stake in the newly privatized industries, Pravin's complaints of discrimination in this regard are unfounded.

In response to this Court's second question, the parties agree that the only other lawsuit pending against Peru or any of its state-owned entities for nonpayment of sovereign debt is *Banco Cafetero (Panama) Ltd. v. The Republic of Peru and Banco de la Nacion*, 94 Civ 3569 (JSM) (S.D.N.Y.).

---

**2.** In addition, it has been reported in the press that proceeds from the Peruvian government's privatization program are being secreted by the government in offshore accounts for the purpose of shielding these funds from the reach of foreign bank creditors. Plaintiff's Letter of July 21, 1995. Defendants' counsel counters this assertion stating only: "The Ministry of Economy and Finance believes it is highly unlikely that the Banco Central would use the privatization proceeds other than as contemplated by Peruvian law and does not believe that any improper use of these proceeds has occurred." Defendants' Letter of August 8, 1995.

In response to this Court's third question, Defendants maintain that a Tolling Declaration dated November 20, 1992 (the "Tolling Declaration") tolls the statute of limitations on short-term working capital debt until November 20, 1998, and that Pravin will have the benefits of the Tolling Declaration if it dismisses this lawsuit. Pravin contends that it is unaware of any tolling agreements in favor of holders of short-term working capital debt.

In response to this Court's fourth question, the parties agree that the *Banco Cafetero* action is the only other action pending in respect of short term working capital debt. Defendants note that Peru has committed to the Bank Advisory Committee not to give creditors who file suit an advantage over creditors abiding by the Tolling Declaration.

In response to this Court's fifth question, the parties agree that the principal amount of Peru's currently unrestructured commercial bank debt is approximately $3.8 billion.

## Discussion

Solvency is maintained by means of a national debt, on the principle, "If you will not lend me the money, how can I repay you." [3]

In *Pravin I* and *Pravin II*, this Court concluded that successive stays of this action, in deference to the Banco Popular liquidation proceedings ongoing in Peru, were warranted by principles of international comity. This action has been stayed for more than eight months. The question before the Court at present is whether the same principles of comity warrant yet another stay, or dismissal, of this action. In their instant motion, in addition to renewing their argument for international comity, Defendants for the first time advance the argument that the assignment of Banco Popular debt by Mellon to Pravin is void because Pravin is not a "finan-

cial institution" as that term is defined in the Mellon Letter Agreement. These arguments will be taken in turn.

### International Comity

■ In the interest of international comity, a court will defer to foreign courts in liquidating or winding up the affairs of their own domestic business entities. *Cunard Steamship Co. Ltd. v. Salen Reefer Services AB*, 773 F.2d 452, 458 (2d Cir.1985). There are exceptions and limitations to this policy however. In the Second Circuit, a court will defer to a foreign bankruptcy proceeding only so long as "the foreign proceeding has not resulted in injustice to New York citizens, prejudice to creditors' New York statutory remedies, or violation of the laws or public policy of the state." *Drexel Burnham Lambert Group Inc. v. Galadari*, 777 F.2d 877, 881 (2d Cir.1985) (remanding action against a citizen of Dubai, United Arab Emirates to collect on a promissory note for an evidentiary hearing to determine whether Dubai bankruptcy proceedings were consonant with New York law and public policy). *See also Clarkson v. Shaheen*, 544 F.2d 624, 629 (2d Cir.1976).

■ Significant here is the teaching of *Allied Bank Int'l v. Banco Credito Agricola*, 757 F.2d 516 (2d Cir.), *cert. dismissed* 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985), in which the Second Circuit held that acts of foreign governments having extraterritorial effect—and consequently falling outside the scope of the act of state doctrine [4]—should nevertheless be extended comity to the extent they are consistent with the law and policy of the United States. 757 F.2d at 522, *citing United States v. Belmont*, 301 U.S. 324, 332–333, 57 S.Ct. 758, 761–62, 81 L.Ed. 1134 (1937).

The plaintiff in *Allied*, the agent for a bank syndicate holding promissory notes issued by

---

3. Ralph Waldo Emerson, *English Traits*, "Ability" (1856).

4. Defendants do not argue that the act of state doctrine applies to this case. In any event, the doctrine is clearly inapplicable in light of the Second Circuit's articulation of the doctrine. *See Allied*, 757 F.2d at 521 (holding that the act of state doctrine precludes judicial review of a foreign sovereign's unilateral suspension of debt

payments *only* if the situs of the debt is within the borders of the foreign sovereign.) Because the situs of the debt in *Allied* was New York, not the foreign country, the act of state doctrine did not apply. The situs of the Banco Popular debt in question here is New York. *See also Drexel Burnham Lambert Group Inc. v. Galadari*, 777 F.2d 877, 881 (2d Cir.1985).

three Costa Rican banks, sought to recover on the notes following the issuance by the Costa Rican government of an executive decree effectively suspending all external debt payments. While the action was pending before the district court, the parties began to negotiate a rescheduling of the debt. After a refinancing agreement was signed, the plaintiff continued to prosecute the litigation on behalf of one bank creditor that refused to participate in the restructuring. The Second Circuit granted summary judgement in favor of the plaintiff, holding that the Costa Rican directives were "inconsistent with the law and policy of the United States" and, therefore, did not warrant deference in the interest of comity. *Allied,* 757 F.2d at 522.

The Second Circuit's attempt to divine United States policy in *Allied* led it to vacate an earlier decision after the Justice Department submitted an *amicus* brief arguing that the Executive Branch did not support Costa Rica's unilateral suspension of foreign debt payments.[5] As a result of the Justice Department's clarification of United States policy, the Court held that while creditors may agree to renegotiate conditions of payment, "the underlying obligations to pay nevertheless remain valid and enforceable." 757 F.2d at 519; *see also Nat'l Union Fire Ins. Co. of Pittsburgh v. People's Rep. of Congo,* 729 F.Supp 936, 944 (S.D.N.Y.1989), (Wood, J.) (holding that "participation in international debt rescheduling agreements is voluntary; foreign governments may not unilaterally impose debt restructuring agreements on unwilling private creditors.")

In *Pravin I,* this Court noted that the instant action is distinguishable from *Allied* in two important ways. First, the creditor/plaintiff in *Allied* had chosen to opt out of a negotiated settlement between Costa Rica and its creditors *after* the negotiation process had been concluded, whereas, in the instant case, Peru's debt restructuring negotiations are ongoing. Second, in *Allied,* Costa Rica's unilateral suspension of foreign debt payments was contrary to the IMF's policy of cooperative resolution of international debt problems, and the Court found the IMF plan to be an integral component of United States policy. In the instant case, in contrast, Defendants argue that Peru's debt restructuring efforts are consistent with a larger IMF plan for revitalizing its economy.

Neither of these distinctions, however, diminishes the relevance or significance of the United States policy concerns articulated in *Allied.* Specifically, the Second Circuit has recognized the interest of the United States in maintaining New York's status as one of the foremost commercial centers in the world, and as an international clearing center for United States dollars, and New York's interest in encouraging foreign debtors to pay debts due in New York. · *Weltover, Inc. v. Republic of Argentina,* 941 F.2d 145, 153 (2d Cir.1991); *Allied* 757 F.2d at 521. In addition, the *Allied* Court emphasized the United States' interest in "ensuring that creditors entitled to payment in the United States in United States dollars under contracts subject to the jurisdiction of United States courts may assume that, except under the most extraordinary circumstances, their rights will be determined in accordance with recognized principles of contract law." *Id.* at 522.

■ Recognizing that prevailing United States policy controls the extent to which this Court must extend comity to Peru's suspension of its foreign debt payments, Defendants argue that United States policy has shifted considerably in the ten years since *Allied* was decided. In particular, Defendants contend that the March 10, 1989 announcement by then Secretary of the Treasury Nicholas F. Brady of a revised policy on international debt marked a shift away from the less forgiving "Baker Plan" in effect when *Allied* was decided. The Brady Plan, however, encourages commercial bank creditors to participate in "debt and debt service reduction *on a voluntary basis,* while recognizing the importance of continued new lending." *See*

5. In its *amicus* brief in *Allied,* the Justice Department noted that the Second Circuit's first decision (that international comity precluded enforcement of the debt at issue) would have an adverse impact on international lending, jeopardize the cooperation of creditors in voluntary restructuring plans, and would effectively set up a new judicial framework, similar to that governing corporate bankruptcies, to enforce country-wide foreign debt restructuring processes.

*Nat'l Union Fire Ins. v. People's Republic of Congo,* 729 F.Supp 936, 944, n. 5 (S.D.N.Y. 1989), (quoting "Address By Secretary of the Treasury Nicholas F. Brady to the Brookings Institution and the Bretton Woods Committee") (emphasis added).

As this Court noted in *Pravin I,* the limited record before the Court suggests that the Clinton Administration policy endorses the Brady Plan's approach to foreign debt restructuring. The record also indicates, however, that the Brady Plan is essentially a call for *voluntary* participation by creditor banks in negotiations with foreign debtor nations to restructure their debt. The Brady Plan does not abrogate the contractual rights of creditor banks, nor does it *compel* creditors to forbear from enforcing those rights while debt restructuring negotiations are ongoing, or prohibit them from "opting out" of settlements resulting from such negotiations. *See A.I. Credit Corp. v. Government of Jamaica,* 666 F.Supp. 629 (S.D.N.Y.1987).

As further evidence of a shift in United States policy on international debt since *Allied* was decided, Defendants direct this Court's attention to the Department of Justice's *amicus* brief in the action *CIBC Bank and Trust Co. (Cayman) Ltd., v. Banco Central Do Brasil, Banco Co Brasil, S.A. and Citibank, N.A.,* 94 Civ. 4733 (S.D.N.Y.1995) (the "CIBC Statement of Interest"). The CIBC Statement of Interest notes that the dramatic increase in the number of secondary market purchasers of sovereign debt since *Allied* was decided has created a climate in which sovereign debtors can no longer count on their creditors being like-minded, similarly situated financial institutions susceptible to peer pressure to negotiate debt restructuring. Noting that purchasers of sovereign debt on the secondary market do not have the same long-range interests as the commercial bank creditors who were the original lenders, the Justice Department expressed concern that the processes that have evolved to deal with sovereign debt problems could be harmed by the attempts of secondary market purchasers to use litigation to extract concessions from sovereign debtors that they were unable to obtain from them through negotiation.

On the other hand, the CIBC Statement of Interest notes that the new class of secondary market purchasers of sovereign debt "plays an important and useful role in the ongoing efforts to deal with sovereign debt by providing added market liquidity." In addition, the CIBC Statement of Interest notes "the Brady Plan's insistence that contractual terms of debt instruments be honored" and emphasizes that "the Brady Plan does not condone a debtor's unilateral repudiation of the stipulated value of a contract or any of the terms of a contract."

Most importantly, however, the CIBC Statement of Interest addresses a factual situation distinguishable from the facts of the instant case. The plaintiff in *CIBC* sought to accelerate its Brazilian debt holding notwithstanding an agreement among Brazil and its creditors that the debt could only be accelerated at the request of banks holding more than 50% of the aggregate unpaid principal. The plaintiff's request to accelerate the debt was thus "premised on an attempt to read into the contract a term restricting the rights of another creditor ..." CIBC Statement of Interest at 19. The CIBC Statement of Interest emphasizes that "the United States does not wish to see a creditor use United States courts as a means of *amending* the terms of sovereign debt contracts." CIBC Statement of Interest at 17 (emphasis added). In contrast, Pravin is not seeking an amendment of the terms of its debt instrument but, rather, enforcement of that instrument as written.

In addition, it appears from the limited facts of the *CIBC* case presented to this Court, that the plaintiff/creditor in *CIBC* had participated in the negotiations leading to, and had signed, together with the majority of Brazil's international commercial creditors, a general debt restructuring agreement, but then sought, through litigation, to amend the terms of the restructuring agreement. In contrast, Pravin has never signed a general debt restructuring agreement, has not participated in any restructuring negotiations and is not represented on the Bank Advisory Committee. In light of this fact, the CIBC Statement of Interest's observation that secondary market sovereign debt purchasers of-

ten have divergent interests from original lender creditors cuts in favor of Pravin. Because Pravin's interests may well diverge from those of the creditor banks comprising the Bank Advisory Committee, the Committee does not provide Pravin with a forum in which to exert influence on the negotiations affecting the restructuring of short term working capital debt.

◼ The most that can be inferred from the CIBC Statement of Interest with reference to the circumstances at issue here is that since the relief sought by Pravin does not exceed the four corners of the Letter Agreement, and as long as any potential harm to the debt restructuring being negotiated predominantly by primary creditors is less than the salutary effect that enforcement would have on the secondary market by indicating that similar foreign debt agreements remain enforceable, enforcement of such agreements comports with present United States policy.

There is yet another reason why the CIBC Statement of Interest is, at best, inconclusive insofar as it may pertain to the policy interests at stake in the instant action. It is the prerogative of the executive branch to intervene, pursuant to 28 U.S.C. § 517,[6] when significant United States interests may be affected by the outcome of a particular action. As the CIBC Statement of Interest notes, "It is within the discretion of the Attorney General to determine when interests of the United States are presented and whether to file a Statement of Interest on behalf of the United States."

◼ In light of the Executive Branch's discretion to determine when United States interests are at stake, this Court takes notice of the fact that the Department of Justice has not submitted a statement of interest in the instant action. In the absence of an authoritative statement of policy from the Executive Branch, this Court remains bound by the authority of the Second Circuit's decision in *Allied Bank Int'l v. Banco Credito Agricola*, 757 F.2d 516 (2d Cir.1985). Where there is a controlling legal standard for adjudicating a claim, this Court should not interpret silence on the part of the Executive Branch as grounds for judicial abstention on grounds of international comity.

### The Assignment From Mellon Bank to Pravin is Valid

◼ Defendants also contend that Mellon Bank's assignment to Pravin is invalid under the terms of the Letter Agreement. In support of this argument Defendants refer to paragraph 5 of the Letter Agreement, which provides in relevant part:

This letter agreement shall be binding upon you [Banco Popular], your successors and assigns, and shall inure to the benefit of us [Mellon], our successors, transferees and assigns. We [Mellon] may assign all or any part of our interest in this letter agreement to any financial institution; ...

Defendants argue that Peru, by assenting to this language,[7] "wanted to limit the parties to which its state-owned entities were indebted and to which it was providing its guarantee." Defendants further contend that Pravin is not a "financial institution" within the meaning of the Letter Agreement. As an initial matter, Defendants' contention (on page 2 of their Supplemental Reply Memorandum) that the assignment is void because Pravin is not a "financial institution" is contradicted by their statement (on page 4 of Defendants' Supplemental Reply Memorandum) that "Peru is not contending that Pravin cannot ever enforce this assignment, just that enforcement should be postponed ..."

◼ Under New York law, where "clear language is used, and the plainest words have been chosen," parties may prohibit the assignment of a contract. *Allhusen v. Caristo Constr. Corp.*, 303 N.Y. 446, 103 N.E.2d 891 (1952); *Macklowe v. 42nd Street Dev't.*

---

6. 28 U.S.C. § 517 provides:
    The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States.

7. Peru, acting through Banco de la Nacion, signed an acknowledgement of the Letter Agreement.

*Corp.*, 170 A.D.2d 388, 566 N.Y.S.2d 606, 606–07 (1st Dep't 1991). In the absence of clear language expressly prohibiting assignment, however, contracts are freely assignable. *See Sullivan v. Int'l Fidelity Ins. Co.*, 96 A.D.2d 555, 465 N.Y.S.2d 235, 238 (2d Dep't 1983) (assignment of contract was valid because contract did not contain language indicating that assignments made without consent shall be void). Paragraph 5 of the Letter Agreement does not contain any express words of limitation on assignability. Moreover, none of the parties to the Letter Agreement undertook to define "financial institution," indicating that the term, as used in paragraph 5, is one of general description rather than a precise restriction on the type of party that may be an assignee of Mellon under the Letter Agreement. This Court concludes that the assignment was proper.[8]

■ In any event, both Peru, through its agent Banco de la Nacion, and Banco Popular, were duly notified on December 12, 1990 of the assignment from Mellon to Pravin. By fax to Pravin dated December 20, 1990, Banco Popular acknowledged both Mellon's assignment to Pravin and Pravin's subsequent assignments to its assignees. Thereafter, Banco Popular made interest payments on the debt directly to Pravin. These actions would suffice to raise an estoppel against defendants even if this Court were to conclude, which it does not, that the assignment was improper at the time it was made.

### Conclusion

For all the reasons stated above, Defendants' motion to dismiss or stay this action is hereby denied. Pravin's motion for summary judgment in its favor regarding the enforcement of Defendants' obligations under the Letter Agreement and the Guaranty is hereby granted.

It is so ordered.

---

**8.** Even if such were not the case, and a precise legal definition of "financial institution" were needed to resolve this question, this Court would look no further than the U.S. Currency and Foreign Transactions Reporting Act, which defines "financial institution" to include broker/dealers in securities or commodities. *See* 31 U.S.C. § 5311 (1982).