ELLIOTT ASSOCIATES, L.P., Plaintiff,

v.

THE REPUBLIC OF PANAMA, Defendant.

No. 96 Civ. 5514(DC).

United States District Court, S.D. New York.

Sept. 10, 1997.

---

Weil, Gotshal & Manges, L.L.P. by Otto G. Obermaier, Mitchell D. Haddad, Ross E. Morrison, New York City, Bainbridge & Straus, Birmingham, AL, for Plaintiff.

Clearly, Gottlieb, Steen & Hamilton by George Weisz, Lee C. Buchheit, Laura M. Williams, Astrid B. Gloade, New York City, for Defendant.

## OPINION

CHIN, District Judge.

In the 1980's, a number of countries—including the defendant Republic of Panama ("Panama")—encountered serious difficulties in servicing their foreign debt. As a consequence, and because of growing concern over the continued stability of the international financial system, United States Treasury Secretary Nicholas Brady announced a plan (the "Brady Plan") in 1989 encouraging bank creditors to reduce the debt obligations of lesser developed countries by restructuring old debt and providing new loans.

Panama took advantage of the Brady Plan and restructured much of its external debt in 1995 pursuant to what became known as the "1995 Financing Plan." The restructured debt included balances due under loan agreements entered into with certain banks and financial institutions in 1978 for $300 million (the "1978 Agreement") and in 1982 for $225 million (the "1982 Agreement").

At issue in the instant case is a portion of the 1982 debt. In late 1995, two of the banks that had participated in the 1982 loan, Citibank, N.A. ("Citibank") and Swiss Bank Corporation ("Swiss Bank") (together, "the Banks"), assigned their interest in $12,242,-018.21 of the debt to plaintiff Elliott Associates, L.P. ("Elliott") for approximately $8 million. After the assignments, Panama (through its Agent) made some interest payments to Elliott, but the payments eventually stopped. For its part, Elliott refused to restructure its debt in accordance with the 1995 Financing Plan, even though all the other creditors under the 1982 Agreement agreed to do so.

Instead, on July 15, 1996, Elliott commenced this breach of contract action, seeking judgment against Panama for the amounts due under the 1982 Agreement. Panama responded by asserting a counterclaim against Elliott for tortious interference with Panama's contractual relations with the Banks.

Before the Court is Elliott's motion for summary judgment, both for judgment on its breach of contract claim and for dismissal of Panama's counterclaim for tortious interference with contract. Elliott's motion is premised in part on its contention that Panama is collaterally estopped by the decision of Justice Gammerman in *Elliott Assocs., L.P. v. Republic of Panama*, No. 603615/96 (N.Y.Sup.Ct. May 16, 1997), a case virtually identical to this one, except that it involved the 1978 Agreement. After Panama defaulted on that loan as well, Elliott purchased some portion thereof from certain of the participating banks. Justice Gammerman granted summary judgment in favor of Elliott and entered judgment against Panama in the amount of $31,441,197. He also dismissed Panama's counterclaim.

Panama contends that summary judgment must be denied because the assignments of the loans to Elliott were improper under the terms of the 1982 Agreement and the 1995 Financing Plan. It also argues that because Elliott purchased the loans with the sole or primary intent to sue, the assignments are void under New York's anti-champerty law.

Although I conclude that the doctrine of collateral estoppel does not bar Panama from asserting its defenses in this case, I also conclude that the defenses must be rejected as a matter of law. The assignments to Elliott were permitted by the agreements in question, and the assignments—arms-length trades of foreign debt—were not champertous. Accordingly, Elliott's motion for summary judgment is granted.

## BACKGROUND

### A. The Agreements

In moving for summary judgment, Elliott argues that it has a valid assignment of the Banks' interests under the 1982 Agreement, that Panama thus has a contractual obligation to Elliott, and that Panama is in

breach of that obligation by failing to repay its debt. Panama argues that the 1982 Agreement has been amended by the 1995 Financing Plan (which was agreed to by both Citibank and Swiss Bank, among others) to prohibit the assignment of debt in the manner in which the loans in question were assigned to Elliott. Moreover, Panama asserts that Elliott tortiously interfered with the implementation of the 1995 Financing Agreement by knowingly seeking assignment of debt contrary to its terms.

Section 14.08 of the 1982 Agreement provides that the Agreement can be "amended, modified or waived" upon the written consent of "the Borrower, the Agent and the Majority Lenders." (Mendez Aff., Ex. A, at 40). Section 1.01 defines "the Majority Lenders" as those "Lenders" who "at any time on or prior to the Commitment Termination Date ... have more than 50% of the aggregate amount of the Commitments and, at any time thereafter, Lenders who at such time hold 50% of the aggregate unpaid principal amount of the Loans." (*Id.* at 6). According to Panama, these conditions were met when Panama and Citibank, Swiss Bank, and other participating banks entered into the 1995 Financing Plan.

In general, the 1995 Financing Plan sets forth the terms of Panama's debt restructuring, including the exchange of principal for new bonds and new arrangements for interest payments. To maintain an orderly process pending its implementation, the Plan also included "Interim Measures," by which each creditor holding debt eligible for restructuring agreed not to "recognize or record any assignment of Eligible Principal or Eligible Interest made after the Final Trading Date" of October 20, 1995. (Mendez Aff., Ex. B, Part V, at V–4). Panama was particularly concerned with establishing a "Final Trading Date" so that it would have a firm date by which it would know which creditors had committed to the Plan. The settlement of such assignments made before the Final Trading Date was to be completed on or before November 10, 1995. (*Id.,* Ex. B, Annex B, at B–5).

The 1995 Financing Plan also required that all creditors participating in the debt restructuring submit a Commitment Letter to Panama no later than November 14, 1995, agreeing: (1) not to assign any debt eligible for restructuring after October 20, 1995; (2) to complete the settlement of all such assignments on or before November 10, 1995; and (3) not to assign any such debt after signing the Commitment Letter except to an assignee who (a) completed the settlement of the assignment on or before November 10, 1995 and (b) agreed (i) to assume the obligations under the Commitment Letter and (ii) to submit a Commitment Letter on or before November 14, 1995. (Mendez Aff. Ex. B, Annex B, at B–5). The Commitment Letter also required that each Lender consent to the Interim Measures described in Part V of the Financing Plan.

According to Panama, after receiving Commitment Letters from "institutions holding more than 50 percent of the then-outstanding amounts under the 1982 Agreement," the 1982 Agreement was amended and modified retroactively to prohibit any assignments after October 20, 1995. (Def. Mem. at 8). It is undisputed that Citibank and Swiss Bank each submitted a Commitment Letter to Panama on November 14, 1995. (Mendez Aff., Ex. D). In fact, Panama alleges that it received Commitment Letters from all of the other banks that held interests in the 1982 Agreement debt. (Def. Mem. at 8). Thus, the 1982 Agreement was amended to include the terms of the 1995 Financing Plan.

## B. *Procedural History*

Elliott originally brought two suits in state court on July 15, 1996, one involving the 1978 Agreement and the other—the instant case—involving the 1982 Agreement. Panama removed both cases to this Court pursuant to 28 U.S.C. § 1441(d). Elliott moved to remand the action involving the 1978 Agreement. I granted that motion, holding that an amendment to the 1978 Agreement, which eliminated Panama's right to remove any state court action to federal court, did not apply to that case because the amendment was made after the suit was brought. *Elliott Assocs., L.P. v. Republic of Panama,* No. 96 Civ. 5295, 1996 WL 474173 (S.D.N.Y. Aug.21, 1996). The instant case had been com-

menced after the amendment was made and thus Elliott did not seek remand of this case.

In the remanded state court action, Elliott raised issues similar to those in this suit, alleging breach of contract and seeking approximately $30 million from Panama due under the 1978 Agreement. *Elliott Assocs., L.P. v. Republic of Panama*, No. 603615/96 (N.Y.Sup.Ct. May 16, 1997). As in this case, Panama asserted a number of affirmative defenses as well as a counterclaim for tortious interference with its contractual relationships with the assignor banks. The principal defenses were: (1) the purported assignments to Elliott were void because they took effect after the Final Trading Date of October 20, 1995; (2) Elliott was not a proper assignee under the 1982 Agreement because assignments were only permitted to banks or financial institutions, and Elliott, according to Panama, was neither a bank nor a financial institution; and (3) Elliott acquired its purported interest in the 1978 Agreement in violation of New York's law against champerty. Elliott then moved for summary judgment, both with respect to its breach of contract claim as well as Panama's counterclaim.

On May 16, 1997, Justice Gammerman dismissed the counterclaim, holding that Panama had not alleged sufficient facts to substantiate a claim for tortious interference. Justice Gammerman also granted Elliott's motion for summary judgment on its breach of contract claim, holding, among other things, that (1) there was no basis to void the assignments to Elliott and (2) there was insufficient evidence to establish that Elliott acquired its interest in the 1978 Agreement in violation of New York's champerty law. *Elliott Assocs.*, No. 603615/96, at 4–8, 10–12.

### DISCUSSION

#### A. Collateral Estoppel

Elliott argues that Panama is collaterally estopped from asserting the champerty defense and its tortious interference with contract counterclaim because Panama has already had a full and fair opportunity to litigate these issues before Justice Gammerman and lost. This argument is rejected.

The doctrine of collateral estoppel, or issue preclusion, bars a party from relitigating in a second proceeding an issue of fact or law that was litigated and actually decided in a prior proceeding, if that party had a full and fair opportunity to litigate the issue in the prior proceeding and the decision of the issue was necessary to support a valid and final judgment on the merits. *Metromedia Co. v. Fugazy*, 983 F.2d 350, 365 (2d Cir.1992), *cert. denied*, 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). The party seeking to invoke the doctrine of collateral estoppel bears the burden of establishing the identity of issues between the prior and present actions. The opposing party has the burden of establishing the absence of a full and fair opportunity to litigate the issue in the prior action. *In re Sokol*, 113 F.3d 303, 306 (2d Cir.1997) (citations omitted).

The state court case involved only the 1978 Agreement; hence, the issues relating to the 1982 Agreement were not directly before Justice Gammerman. For example, in rejecting Panama's champerty defense as a matter of law, Justice Gammerman considered the issue of Elliott's intent only with respect to the 1978 Agreement. He did not reach the issue of Elliott's intent in purchasing the 1982 debt. Thus, as the issue of Elliott's intent with respect to the 1982 Agreement was not "actually decided" in the state court proceeding, and resolution of that issue was not "necessary to support a valid and final judgment on the merits," *Metromedia Co.*, 983 F.2d at 365, Panama is not collaterally estopped by Justice Gammerman's decision from pressing its defenses in the instant case. Nonetheless, because the issues presented are closely related, Justice Gammerman's decision must be given serious consideration.

#### B. Elliott's Breach of Contract Claim

Elliott's entitlement to recover the amounts due under the 1982 Agreement turns on the validity of the assignments of the debt to Elliott from the Banks. Panama contends that the assignments were invalid because: (1) they were obtained after the Final Trading Date established in the 1995

Financing Plan; (2) Elliott is not a proper assignee under the 1982 Agreement; and (3) the assignments were obtained in violation of New York's champerty law. Panama also argues that summary judgment is improper at this time because it has not had a full and fair opportunity for discovery. I address each of these arguments in turn.

### 1. *The Timing of the Assignments*

Under the 1995 Financing Plan, banks could not "recognize or record" any assignments of debt "made after the Final Trading Debt" of October 20, 1995. (Mendez Aff., Ex. B, Part V, at V–4). The 1995 Financing Plan gave the banks until November 10, 1995 to complete the "settlement" of assignments made by October 20, 1995. (*Id.*, Ex. B, Annex B, at B–5). As summarized in Annex B:

> Pursuant to the Commitment Letter, each Lender will agree not to assign any of its Eligible Debt after October 20, 1995 (the *"Final Trading Date"*) and to complete the settlement of all such assignments on or before November 10, 1995. . . .

(*Id.*). Hence, the 1995 Financing Agreement contemplated two different dates for trading—or assigning—eligible debt: the date the trade was made and the date the trade was settled.

The evidence submitted by Elliott shows unequivocally that the assignments were timely because both dates were met. That evidence includes the following: Jay H. Newman stated under oath that the Swiss Bank assignment was made on October 17, 1995 and the Citibank assignment on October 19, 1995. (Newman Aff. ¶¶ 9, 11). His sworn statement is corroborated by hand-written trade tickets and confirmatory documents. (Newman Aff., Exs. 5, 7). He also stated under oath that these trades were "settled" by the two "Assignment Notices" dated October 31, 1995 and November 6, 1995, respectively. (Newman Aff. ¶¶ 10, 12 & Exs. 6, 8). In addition, Elliott submitted copies of letters written to Justice Gammerman by counsel for Citibank and Swiss Bank in the state court case confirming that the trades were made before October 20, 1995 and settled before November 10, 1995. (Newman Reply Aff., Exs. T, U). Moreover, it is undisputed that after Panama was notified in December 1995 by the Agent that Citibank and Swiss Bank assigned their interests to Elliott, the Agent acknowledged Elliott's assignments and registered Elliott as a creditor of Panama under the 1982 Agreement. (Newman Aff., Ex. 9). The Agent further demonstrated its acknowledgement of the validity of the assignments by subsequently paying, with Panama's knowledge, $973,289 in interest on the 1982 debt to Elliott. (Newman Aff., Exs. 6, 8, 9). Finally, Panama has not disputed that all 48 trades involving the 1982 Agreement were settled by assignment notices that were "effective" after October 20, 1995 and that all of these assignments—except for the two involving Elliott—were accepted by the Agent and Panama. (Newman Reply Aff. ¶ 29). On this record, a reasonable factfinder could only conclude that the assignments were timely: that they were made before October 20, 1997 and that they were "settled" before November 10, 1997.

Panama's contention that the assignments to Elliott at issue in this case were not made until after October 20, 1995 is based solely on the two "Assignment Notices" submitted to Panama and the Agent from the Banks and Elliott. (Def. Mem. at 20–21; Mendez Aff. Exs. E, F). Both of these Assignment Notices are dated after October 20, 1995 and state that the assignments to Elliott take effect on dates after the Final Trading Date. (Mendez Aff., Exs. E, F). The assignment from Swiss Bank is dated October 31, 1995 and states that the assignment "is effective October 31, 1995." The assignment from Citibank is dated November 6, 1995 and states that it "is effective from November 6, 1995." Panama argues that these documents show that Elliott and the Banks acknowledge that "they had assigned an interest in the 1982 Agreement *after* October 20, 1995." (Mendez Aff. ¶ 29).

The two assignment notices are insufficient to raise a genuine issue of fact, for the record shows clearly that the dates of the assignment notices are the dates the assignments were "settled." The dates of both notices, of course, precede the November 10, 1995 "settlement" date. A reasonable factfinder could only conclude that the assignment notices

merely consummated—or made effective—trades that were made before the Final Trading Date.

Panama also argues that the Agent was "misled" into registering Elliott as a creditor under the 1982 Agreement and paying it interest. But Panama has submitted no evidence to support this contention; rather, its argument that the Agent was misled is based solely on its contention that because the assignment was not made prior to October 20, 1995 it was misleading for Elliott to have represented otherwise. The difficulty with this argument, of course, is that it assumes the assignments were made after October 20th when clearly they were not.

Panama also alleges that even if the assignments were completed before the Final Trading Date, Elliott would then be required to restructure because it would then be bound by the 1995 Financing Plan. (Mendez Aff. ¶ 32). This argument, however, is simply wrong, as the plain language of the Commitment Letters makes clear. Citibank and Swiss Bank both executed Commitment Letters on November 14, 1995 stating in pertinent part:

> We further agree that *after* the date of this Commitment Letter, we will only assign our Eligible Debt to an assignee that ... agrees ... to assume our commitment and related obligations [under the 1995 Financing Plan].

(Mendez Aff., Ex. D, at 3) (emphasis added). As the underscored language makes clear, this obligation existed only with respect to assignments made "*after* the date of [the] Commitment Letter[s]." Because the assignments were made to Elliott and settled *before* the Commitment Letters were executed, Elliott was not required to assume the Banks' obligations under the 1995 Financing Plan and thus Elliott was not bound to restructure.

### 2. *Financial Institution*

Under section 14.07 of the 1982 Agreement,

Each Lender may at any time sell, assign, transfer ... or otherwise dispose of ... its Loans ... to other banks or financial institutions.

(Mendez Aff., Ex. A, at 39–40). Panama argues that Elliott is not a "bank" or "financial institution" and that therefore Elliott is not a proper assignee.

■ Panama's contention is rejected, for two reasons. First, Elliott is a "financial institution" for purposes of the 1982 Agreement as a matter of law. The 1982 Agreement does not define the term "financial institution." As an entity that trades in securities and loans, Elliott is at least arguably a "financial institution." Moreover, Panama has accepted assignments involving similar entities that do not perform "traditional banking functions." (Newman Reply Aff. ¶¶ 22–23; Ex. V). Likewise, as noted above, the Agent accepted Elliott as a creditor under the 1982 Agreement and paid Elliott some interest. Hence, Elliott is a "financial institution" for these purposes and the assignment was proper. *See Pravin Banker Assocs., Ltd. v. Banco Popular del Peru,* 895 F.Supp. 660, 668 (S.D.N.Y.1995) (holding assignment was proper, in part because Peru, through its agent, acknowledged assignments and subsequently made interest payments), *aff'd,* 109 F.3d 850 (2d Cir.1997).

■ Second, even assuming Elliott was not a financial institution (or a bank), it would still have been eligible under the 1982 Agreement to be an assignee. In affirming Judge Sweet's decision in *Pravin Banker,* the Second Circuit held that similar language in a loan agreement expressly *permitting* assignments to "any financial institution," without restricting assignments "expressly in any way," did not prohibit an assignment to an entity that was not a financial institution. 109 F.3d at 856. The court noted that New York law provides that "only express limitations on assignability are enforceable." *Id.* Here, section 14.07 of the 1982 Agreement contains permissive language only—it does not expressly restrict assignments to banks and financial institutions. Consequently, Elliott was a proper assignee, even assuming it was not a bank or financial institution.

### 3. *Champerty*

■ Panama also argues that the assignments of the 1982 debt to Elliott were void

because Elliott acquired the loans with the intent and purpose of bringing suit, in violation of the New York anti-champerty statute.

Under section 489 of the New York Judiciary Law,

[n]o corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and purpose of bringing an action or proceeding thereon....

N.Y. Judiciary Law § 489 (McKinney 1983). To void the assignments, Panama must prove that Elliott's purchases of the debt were made for the "sole" or "primary" purpose of bringing suit. *Elliott Assocs. v. Republic of Peru,* 948 F.Supp. 1203, 1208 (citing *CIBC Bank & Trust Co. v. Banco Central do Brasil,* 886 F.Supp. 1105, 1110 n. 6 (S.D.N.Y. 1995)).

 Section 489 is a criminal statute. Its purpose is to "prevent the resulting strife, discord and harassment which could result from permitting ... corporations to purchase claims for the purpose of bringing actions thereon...." *Banque de Gestion Privee–Sib v. La Republica de Paraguay,* 787 F.Supp. 53, 56 (S.D.N.Y.1992) (citing *Fairchild Hiller Corp. v. McDonnell Douglas Corp.,* 28 N.Y.2d 325, 321 N.Y.S.2d 857, 860, 270 N.E.2d 691, 693 (1971)). A plaintiff who acquires a claim in violation of this provision may not recover on the claim, for assignments made in violation of section 489 are void. *See, e.g., Refac Int'l, Ltd. v. Lotus Development Corp.,* 131 F.R.D. 56, 58 (S.D.N.Y.1990) (finding assignment champertous where primary purpose was to enable plaintiff to commence actions as another party's surrogate); *Koro Co. v. Bristol–Myers Co.,* 568 F.Supp. 280, 288 (D.D.C.1983) (applying New York law to void stock purchase transaction made solely for the purpose of plaintiff bringing antitrust claim); *American Optical Co. v. Curtiss,* 56 F.R.D. 26, 31 (S.D.N.Y.1971) ("Section 489 ... prohibits the taking of an assignment by a corporation with the intent to sue thereon, regardless of

whether the claim is structured to appear to belong to the corporation or to the assignor."); *Frank H. Zindle, Inc. v. Friedman's Express, Inc.,* 258 A.D. 636, 17 N.Y.S.2d 594 (1st Dep't 1940) (holding that champerty law barred recovery where plaintiff's "only interest in the assignment was to bring a suit thereon and to earn a fee from the proceeds in the event that the prosecution of the suit was successful").

 Panama has failed to present evidence sufficient to raise a genuine issue of material fact as to its claim of champerty. Indeed, to the contrary, the indisputable evidence shows that Elliott's purchase of the loans was not champertous as a matter of law.

Elliott paid some $8 million for the notes, not just a token sum. *Cf. Aubrey Equities, Inc. v. SMZH 73rd Assocs.,* 212 A.D.2d 397, 622 N.Y.S.2d 276, 278 (1st Dep't 1995) (finding questions of fact as to whether assignment was champertous where only token consideration was paid). Elliott acquired all right, title and interest in the notes, not simply the right to sue. *Cf. Koro,* 568 F.Supp. at 287 (holding assignment champertous where made solely to enable plaintiff to sue on the claim). Unlike in other cases where the assignor retained an interest in the outcome of litigation, Citibank and Swiss Bank retained no interest in the notes and had no stake in any litigation that might be brought on the notes. *See Refac Int'l,* 131 F.R.D. at 57 (finding assignment champertous where assignor retained 95% of interest in patent, and assignee, who was to bring suit for patent infringement, received 5% interest). Nor were the assignments conditioned on Elliott's bringing suit, as is often the case when courts find assignments to be champertous. *See id.* at 58 (holding assignment champertous where "primary purpose" was "to enable [plaintiff] to commence actions as [another party's] surrogate plaintiff"); *American Optical,* 56 F.R.D. at 30 (finding assignment would have been champertous if conditioned on filing suit); *Zindle,* 17 N.Y.S.2d at 594 (finding assignment champertous where plaintiff's only interest in assignment was potential recovery from suit).

Elliott clearly had a "legitimate business purpose" in purchasing the debt. *Limpar Realty Corp. v. Uswiss Realty Holding, Inc.,* 112 A.D.2d 834, 492 N.Y.S.2d 754, 756 (1st Dep't 1985). The purchases of the debt for $8 million from Citibank and Swiss Bank—two established financial institutions—were arms-length transactions. Foreign debt is actively traded in the market, and when Elliott bought the loans, there surely existed the possibility that it would re-trade them.[1] Indeed, in opposing the motion Panama submitted a copy of a letter from Swiss Bank to Elliott offering to buy back the loan, stating that "we estimate that under current market conditions you will more than double the value of your investment." (Letter dated Feb. 26, 1997 from Swiss Bank to Elliott). Hence, Elliott apparently had already doubled its investment in less than two years. Finally, there also existed the possibility that the economy of Panama would improve and that, as a consequence, Panama would have the ability to repay the loans in full or at a discount that Elliott would find acceptable.

Panama argues that the assignments are champertous because, as it contends additional discovery would show, Elliott bought the loans with the sole or primary intent to sue. Panama has submitted no evidence to support that claim, however, other than its counsel's affidavit alleging that Newman and one of Elliott's attorneys have been engaging in a "pattern and practice" of buying defaulted debt on the secondary market and bringing suit on such debt. (Weisz Aff. ¶ 13). According to Panama, Elliott first purchased the debt at issue shortly after Paul Singer, Elliott's general partner, was solicited by Newman, and Newman has an oral agreement with Elliott by which he will obtain an undisclosed percentage of any profits Elliott wins in this suit. (Def. Mem. at 25; Weisz Aff. ¶ 13). Even if all of these allegations are true, as Justice Gammerman held, they do not require an inference or determination that Elliott's actions were champertous. *Elliott Assocs.,* No. 603615/96, at 12.

I will assume, for purposes of this motion, that when Elliott purchased the loans, it had the intent to sue if necessary to collect on the loans. But as Judge Mukasey held in *Banque de Gestion Privee–Sib v. La Republica de Paraguay,* 787 F.Supp. 53, 57 (S.D.N.Y. 1992), "an intent to sue if necessary to enforce rights acquired pursuant to [an] assignment" does not by itself render the assignment champertous. Rather,

[f]or over a century, New York courts have recognized that the law does not prohibit

discounting or purchasing bonds and mortgages and notes, or other choices in action, either for investment or profit, or for the protection of other interests, and such purchase is not made illegal by the existence of the intent ... at the time of the purchase, *which must always exist in the case of such purchases,* to bring suit upon them if necessary for their collection.

*Id.* at 57 (quoting *Moses v. McDivitt,* 88 N.Y. 62, 65 (1882)) (emphasis added).

It may be, as Panama alleges, that when Elliott purchased the loans, it had no intention of participating in the restructuring under the 1995 Financing Plan and that it hoped to gain an advantage thereby in negotiating with Panama for payment. Although one could reasonably quarrel with the seemliness of this investment strategy or the propriety in general of such "vulture fund" tactics as investing in distressed companies or loans, criminal statutes must be narrowly construed, and the purchase of a loan in the circumstances of this case surely does not rise to the level of criminal conduct.

Even assuming Elliott had no intention of participating in the 1995 Financing Plan, no reasonable factfinder could conclude that it spent $8 million just to enjoy the pleasures of litigation. To the contrary, clearly there were possibilities other than litigation when Elliott purchased the loans: (i) Elliott could have re-traded the loans on the market; (ii) Panama could have re-paid the loans in full;

---

1. As Justice Gammerman noted in granting summary judgment in favor of Elliott in the state court case: "[I]t is well known that individuals and entities contract to buy and sell the foreign debt of sovereign nations, and that this is a legitimate business undertaking, with a legitimate business goal of making a profit." *Elliott Assocs., L.P. v. Republic of Panama,* No. 603615/96, at 11–12 (S.Ct.N.Y.Co. May 16, 1997).

and (iii) Elliott and Panama could have agreed on a discount that would still have permitted Elliott to turn a profit. The fact that Elliott was prepared to file suit if none of these possibilities materialized did not render the assignments champertous.

### 4. *Additional Discovery*

▪ Panama has submitted a Rule 56(f) affidavit and argues, both with respect to the issue of the timing of the assignments as well as the question of champerty, that it has not had a full and fair opportunity to take discovery. *See Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir.1995). Panama relies heavily on Judge Sweet's decision in *Elliott Assocs., L.P. v. Republic of Peru,* 961 F.Supp. 83 (S.D.N.Y.1997). There, Judge Sweet denied Elliott's motion for summary judgment in a similar case against Peru. Although Judge Sweet acknowledged that no prior authority had upheld a champerty defense in comparable circumstances, he denied summary judgment and permitted further discovery in the case because the "determination of champertous intent is 'decidedly fact-specific'" and evidence relating to the "key issue" of Elliott's intent was "largely" within Elliott's control. 961 F.Supp. at 85–86.

Significantly, no depositions had been taken in the *Peru* case when Elliott moved for summary judgment. In contrast, in the present case Panama has taken the deposition of the two key individuals on Elliott's side, Singer and Newman; hence, Panama has had an opportunity to probe Elliott's intent in purchasing the loans. Although Panama now contends that Singer and Newman were "evasive" at their depositions, no application was ever made for an order compelling them to give additional testimony or more complete answers. In addition, although Panama has had the opportunity to take the depositions of Citibank and Swiss Bank, it has elected not to do so. (*See* Letter dated May 8, 1997 from George Weisz, Esq. to the Court). Hence, Panama cannot be heard to complain that it has not had a sufficient opportunity for discovery.

In fairness, Panama did seek the deposition of Michael Straus, Esq., co-counsel for Elliott. It also has identified some additional

discovery it wishes to take. At this juncture, however, given (i) the discovery that has been taken, (ii) the discovery that Panama could have taken but did not take, (iii) the evidence (or lack thereof) Panama is reasonably likely to find if further discovery is permitted, and (iv) the assumptions I have made above, no further discovery is warranted. *See Fairchild Hiller Corp. v. McDonnell Douglas Corp.,* 28 N.Y.2d 325, 321 N.Y.S.2d 857, 860, 270 N.E.2d 691, 693 (1971) (finding further discovery not warranted and rejecting champerty defense on motion for summary judgment where undisputed facts established plaintiff did not receive assignment for "sole" and "primary" purpose of bringing action thereon).

Because no genuine issue of material fact exists to be tried with respect to any of Panama's defenses, Elliott's motion for summary judgment on its breach of contract claim is granted.

### C. *Panama's Counterclaim*

▪ The final issue is the viability of Panama's counterclaim for tortious interference with contract. Under New York law, to establish a claim of tortious interference with contract, a plaintiff must prove: (1) the existence of a contract; (2) defendant's knowledge thereof; (3) defendant's intentional inducement of a breach of that contract; and (4) damages. *G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762, 767 (2d Cir.1995); *see also International Minerals & Resources, S.A. v. Pappas,* 96 F.3d 586, 595 (2d Cir. 1996); *Finley v. Giacobbe,* 79 F.3d 1285, 1294 (2d Cir.1996).

Elliott argues that Panama's claim for tortious interference must be dismissed because Panama has failed, among other things, to demonstrate the existence of a genuine issue of fact with respect to the intent aspect of the third element. I agree. Hence, Elliott's motion for summary judgment is granted.

▪ The intent required to sustain a claim for tortious interference with contract is "exclusive malicious motivation." *Wegman v. Dairylea Coop., Inc.,* 50 A.D.2d 108, 376 N.Y.S.2d 728, 736 (4th Dep't 1975); *accord Sadowy v. Sony Corp. of America,* 496

**342**

F.Supp. 1071, 1080 (S.D.N.Y.1980); *see also Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.,* 179 A.D.2d 592, 579 N.Y.S.2d 353, 354 (1st Dep't 1992) (inducement must be "malicious or carried out with the intent to harm the plaintiff"). The action must have been taken by the defendant "without justification, for the sole purpose of harming the plaintiffs." *Benjamin Goldstein Productions, Ltd. v. Fish,* 198 A.D.2d 137, 603 N.Y.S.2d 849, 851 (1st Dep't 1993).

Here, a reasonable factfinder could only conclude that Elliott was not acting with "exclusive malicious motivation" or for the "sole purpose" of harming Panama. To the contrary, Elliott spent some $8 million. It did that not because it wanted to hurt Panama or interfere with Panama's contracts, but because of the most basic of motivations—it wanted to make money. Elliott invested in the foreign debt because it was hoping to turn a profit.

Hence, no genuine issue of material fact exists as to the third element of tortious interference with contract and the counterclaim must be dismissed.

### CONCLUSION

For the reasons set forth above, Elliott's motion for summary judgment is granted in all respects. Elliott shall submit a proposed judgment on notice within ten days hereof. If the parties cannot agree on the amount of unpaid principal or the calculation of prejudgment interest, each side shall promptly submit an affidavit with supporting documentation setting forth its calculations of damages and interest.

SO ORDERED.