<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-2011

                      ROBERT J. HENNESSY,

                     Plaintiff, Appellant,

                               v.

                    CITY OF MELROSE, ET AL.,

                     Defendants, Appellees.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

        [Hon. Douglas P. Woodlock, U.S. District Judge]

                             Before

                     Selya, Circuit Judge,
                                
                Coffin, Senior Circuit Judge,
                                
                  and Lipez, Circuit Judge.
                                
                                
                                
    William P. Monahan for appellant.
    Regina M. Gilgun, with whom Douglas I. Louison and Merrick,
Louison & Costello were on brief, for municipal appellees.
    Salvatore M. Giorlandino, Assistant Attorney General, with
whom Thomas F. Reilly, Attorney General of Massachusetts, was on
brief, for remaining appellees.

October 22, 1999

                                
                                

 SELYA, Circuit Judge.  This appeal implicates the
delicate balance between the need of educational institutions to
have a relatively unfettered hand in order to perform their core
mission effectively and the rights of teachers (and aspiring
teachers) freely to express themselves.  On particular facts, the
district court reconciled that balance against plaintiff-appellant
Robert J. Hennessy.  At the same time, the court rejected several
other claims that Hennessy had brought.  Hennessy now appeals.  We
affirm.
I.  BACKGROUND
 In accord with the summary judgment standard, we limn the
facts as hospitably to the appellant's claims as the record
permits, indulging all reasonable inferences in his favor.  See
Coyne v. Taber Partners I, 53 F.3d 454, 456 (1st Cir. 1995).
 The Commonwealth of Massachusetts operates Salem State
College.  Matriculation there offers students, inter alia, the
opportunity to obtain both a baccalaureate degree in education and
a teaching certificate (a sine qua non to securing a faculty
position in a public school within the Commonwealth).  The issuance
of such a certificate, in turn, hinges on successful completion of
a student teaching practicum.
 When the events giving rise to this suit transpired, the
appellant had completed three years of a four-year curriculum at
Salem State.  In the first semester of his senior year, he enrolled
in a class on multiculturalism taught by Dr. Mary-Lou Breitborde,
the chair of Salem State's Department of Education.  Over the
course of the semester, Breitborde became concerned about the
appellant's unusually forceful espousal, at inappropriate times, of
religiously oriented views on subjects such as homosexuality and
abortion (e.g., his submission of a paper wrapped in a picture of
a fetus, even though the paper had nothing to do with reproductive
rights).  In light of these experiences and corroborative reports
received from other docents, Breitborde met with the appellant to
address his suitability for pursuing a teaching career in the
public schools.
 At the meeting, Breitborde expressed concerns about the
appellant's ability to adhere to state-mandated professional
standards, especially in regard to respect for diversity among
school children.  When she specifically asked for an assurance that
he would refrain from proselytizing in the classroom, he indicated
that such an assurance would be hard to provide in view of his
strong belief that children should regard Jesus Christ as their
salvation.  The audience concluded with Breitborde's statement that
she would need to ponder whether the appellant could continue in
Salem State's teacher certification program.  A faculty member
subsequently told Breitborde that the appellant had completed an
earlier part-time placement in a public school without incident.  
This piece of information apparently tipped the balance and she
decided to give him the benefit of the doubt.
 In January of 1996, Salem State, acting with Breitborde's
approval, placed the appellant at the Horace Mann Elementary
School, Melrose, Massachusetts, for a student teaching practicum,
and assigned him to assist Richard McDermod in instructing a
fourth-grade class.  Dr. John Mangini, a Salem State faculty member
responsible for evaluating the appellant's performance at Horace
Mann, reported during the initial stages of the practicum that he
was doing well.
 In March, the situation began to deteriorate.  Four
incidents occurred.  We summarize what the record shows.
    The Everson Conversation.  During a
 conversation that took place on an
 undetermined date, the appellant showed a
 picture of an aborted fetus to a teacher,
 Carol Everson.  His behavior and demeanor
 frightened Everson and she voiced her
 trepidation to Horace Mann's principal, Dr.
 Judy DeLucia.

    Family Fiesta Night.  On March 26, the
 appellant balked at participating in a
 multicultural assembly called "Family Fiesta
 Night"   an event in which his fourth-grade
 class was actively involved.  When McDermod
 directed the appellant to attend, he did so
 grudgingly.  Once there, he called the dancing
 "silly" and "inappropriate," and left almost
 immediately.  He made no bones about the fact
 that he considered the performances lewd and
 offensive to principles of "biblical
 sobriety."

    Regarding Art.  Three days later, the
 appellant's class attended a presentation by
 parent volunteers entitled "Regarding Art."  
 One of the presenters introduced a well-known
 painting by Renato Cesaro which parodied a
 traditional (Leonardo da Vinci) rendition of
 the Last Supper and depicted Hollywood stars
 in lieu of Christ and the apostles.  The
 appellant termed the display "disgusting,"
 branded the Cesaro painting "obscene," and
 stormed out of the class.  He did not return
 for over an hour.  Thus, he was not available
 to conduct a previously scheduled teaching
 assignment and McDermod had to pinch-hit for
 him.

    The DeLucia Interview.  The contours of the
 practicum called for the appellant to function
 as the fourth-grade class's sole instructor
 during the following week.  Worried about that
 configuration in light of recent developments,
 McDermod expressed his concerns to DeLucia.  
 At about the same time, the parent who had
 introduced the Cesaro painting told DeLucia
 that she would not be comfortable with the
 appellant handling her son's class.  DeLucia
 nonetheless permitted the appellant to take
 over the class on Monday, April 1.  In mid-
 day, she summoned him to her office and
 inquired about the Family Fiesta Night and
 Regarding Art episodes.  The appellant
 explained that "you can't serve God and
 Mammon," that he had chosen the former, and
 that he was more interested in pleasing God
 than in pleasing the principal.  According to
 DeLucia, he then stated that he viewed her as
 "the devil" and the Horace Mann faculty as her
 disciples.  When the appellant persisted in
 arguing that it was wrong to allow religion to
 be denigrated in the public schools, DeLucia
 terminated the interview and the appellant
 returned to his fourth-grade class.

 On the afternoon of April 1, DeLucia instructed the
appellant to meet with the school superintendent.  He declined,
indicating that he first wanted to discuss the matter with his
priest.  DeLucia then told the appellant that he could not resume
practice teaching until a consultation took place with Salem State.  
She simultaneously notified the local police department that she
was concerned about his erratic behavior.
 The next day, DeLucia informed a Salem State official
that the appellant would not be allowed to continue his practicum.  
In a follow-up letter, she cited the four incidents catalogued
above.  Salem State promptly convened a meeting of faculty members
and administrators who decided that the appellant's behavior, as
reported, appeared to violate numerous provisions of the applicable
student code of conduct.  On this basis, Salem State temporarily
suspended the appellant and notified him that he was entitled to an
immediate hearing.  The suspension was carried out in accordance
with the student judicial system's emergency procedures.
 The appellant contacted the appropriate college official
and learned the nature of the charges, who had made them, and how
the hearing process worked.  Although offered a hearing within 24
hours, the appellant demurred, ostensibly because he did not wish
to go forward without first having retained a lawyer.  By the time
that he procured counsel   late April   DeLucia had told Salem
State that she would not testify at a disciplinary hearing.  In
view of her recalcitrance, Salem State rescinded the temporary
suspension and dropped the disciplinary proceedings.
 Despite this turn of events, the Melrose school system
stood firm in its refusal to allow Hennessy to resume student
teaching.  On May 15, Salem State sent him a letter advising that
he had (a) failed his student teaching practicum due to the
premature termination of his placement, and (b) failed to meet four
of the common teaching competencies (communication skills, self-
evaluation, equity, and professionalism) required for certification
by the Massachusetts Department of Education (MDOE).  Although the
letter invited the appellant to continue in Salem State's non-
certification education program, he neither accepted this
invitation nor sought to be heard on the subject of his ouster from
the certification program.
 The battle then shifted to a judicial forum.  Invoking 42
U.S.C.  1983, 1985(3), and 1986, the appellant sued a throng of
defendants.  For ease in reference, we divide them into moieties:  
DeLucia and the City of Melrose (collectively, the Melrose
defendants) on one hand, and the Commonwealth and numerous Salem
State hierarchs (collectively, the Salem State defendants) on the
other.  He alleged myriad violations of his rights to free speech,
free exercise, equal protection, and due process.  Following some
preliminary skirmishing, not relevant here, the district court
granted the defendants' motions for summary judgment.  This appeal
ensued.
II.  ANALYSIS
 Summary judgment is appropriate where "[t]he pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no genuine
issue as to any material fact and that the moving party is entitled
to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  
Appellate review of summary judgment orders is de novo.  See Cadle
Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997); Garside v. Osco
Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990).  The particulars
attendant to such review are familiar, see, e.g., Coyne, 53 F.3d at
457 (listing applicable principles and citing representative
cases), and it would be pleonastic to rehearse them here.
 In mounting his appellate arguments, Hennessy opts for
quantity over quality.  We have sifted through his asseverational
array and conclude that most of his claims do not require comment
because they are patently frivolous, entirely lacking in record
support, or both.  For example, it is transparently clear that the
appellant has no equal protection claim against anyone; he has not
brought himself within any protected class and he has failed to
show that others, similarly situated, were treated differently.  
See Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 354 &
n.13 (1st Cir. 1995).  By like token, he has failed to identify a
relevant custom or policy of the City of Melrose, thus negating any
claim of municipal liability.  See Polk County v. Dodson, 454 U.S.
312, 326 (1981).  He has made no showing that the defendants'
conduct originated in an invidiously discriminatory class-based
animus, and, thus, his conspiracy claim under 42 U.S.C.  1985(3)
founders.  See Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).  
This same circumstance dooms his section 1986 claim.  See Creative
Env'ts., Inc. v. Estabrook, 680 F.2d 822, 834-35 (1st Cir. 1982).  
We therefore restrict our discussion to the appellant's two most
promising assertions, namely, (1) that the Melrose defendants
violated his First Amendment rights, and (2) that the Salem State
defendants abridged his Fourteenth Amendment right to procedural
due process.
                 A.  The First Amendment Claim.
 In order to put this claim into perspective, we first
must intuit the nature of the relevant relationship.  The appellant
argues ferociously that he should be treated as a student vis--vis
the Melrose defendants.  We do not agree.  Although the appellant's
placement at Horace Mann related to his role as a Salem State
undergraduate, he was not at Horace Mann to take the courses
offered there, and, thus, was not in any meaningful sense a pupil
of Horace Mann.  Rather, his position more nearly approximated that
of an apprentice, that is, Horace Mann relied on him in essentially
the same way that it would rely on any teacher-in-training or
teacher's aide.  He was there to master the rudiments of a
profession and, in return, he was expected to work with the primary
teacher and other school personnel to implement the designated
curriculum and to participate in class activities.  Though unpaid,
this apprentice-type relationship more closely resembles an
employer-employee relationship than a school-pupil relationship.  
We conclude, therefore, that the employer-employee model furnishes
the best analogy here and that the case law dealing with the First
Amendment in the government employment context, rather than the
public school student context, provides the appropriate framework
for our inquiry.  See Andersen v. McCotter, 100 F.3d 723, 726 (10th
Cir. 1996) (holding that a student intern, working for college
credit in a penitentiary, was properly treated as a public employee
rather than as a student in a suit against the Department of
Corrections alleging First Amendment violations).
 The appellant's student teaching position plainly was at
will, rendering it susceptible to termination at the school's
discretion.  See Bishop v. Wood, 426 U.S. 341, 347 (1976).  Even an
at-will employee, however, may not be dismissed for exercising
rights protected under the First Amendment.  See Mount Healthy City
Bd. of Educ. v. Doyle, 429 U.S. 274, 283-84 (1977).  A plaintiff
who claims to have been discharged in violation of this rule bears
an initial burden of showing that he had engaged in
constitutionally protected speech or conduct and that such activity
was a substantial or motivating factor underlying his discharge.  
See id. at 287.  If the plaintiff succeeds in shouldering that
burden, liability will attach unless the defendant can demonstrate
by a fair preponderance of the evidence that the ouster would have
occurred even without the protected activity.  See id.
 The district court followed this basic approach.  It
assumed that the First Amendment safeguarded some of the activities
described by DeLucia in her communique to Salem State but ruled
that the record compelled the conclusion that the appellant's job
performance, rather than his protected speech, prompted the Melrose
defendants' decision.  Although we arrive at the same destination,
we pursue a somewhat different analytical path.  See Garside, 895
F.2d at 48-49 (explaining that "in appraising summary judgments .
. . a court of appeals is not wedded to the district court's
reasoning").
 The district judge, in passing upon the sufficiency of
the Melrose defendants' proof that the protected activity was not
a substantial or motivating factor in the decision to dismiss the
appellant, drew a distinction between constitutionally protected
expression and the job-related effects of that expression.  The
Supreme Court, however, has shown a preference for a different
analytic methodology   one which incorporates consideration of the
job-related effects of expression into the logically antecedent
question of whether the expression was protected in the first
place.  See, e.g., Waters v. Churchill, 511 U.S. 661, 680 (1994);
Rankin v. McPherson, 483 U.S. 378, 388 (1987); Connick v. Myers,
461 U.S. 138, 150-52 (1983); Givhan v. Western Line Consol. Sch.
Dist., 439 U.S. 410, 415 n.4 (1979); Pickering v. Board of Educ.,
391 U.S. 563, 568 (1968).  We emulate the Court's example and
examine at the outset whether any of the bases for the appellant's
dismissal involved protected speech or expressive conduct.  
Answering this question requires us to strike "a balance between
the interests of the teacher, as a citizen, in commenting upon
matters of public concern and the interest of the State, as an
employer, in promoting the efficiency of the public services it
performs through its employees."  Pickering, 391 U.S. at 568; see
also Waters, 511 U.S. at 675 (discussing the heightened interest of
the government qua employer "in achieving its goals as effectively
and efficiently as possible").
 We start with whether the expressive conduct that formed
the basis of DeLucia's decision to banish the appellant related to
matters of public concern.  See Connick, 461 U.S. at 146.  If so,
we then must weigh the appellant's interest, as a citizen, in
expressing himself on these matters against Melrose's interest, as
an employer, in delivering efficient services.  See id. at 150; see
also Pickering, 391 U.S. at 568.  Although this tamisage at first
blush may appear to be a task for the factfinder, the process
ultimately embodies a legal determination appropriately made by the
court in circumstances in which no genuine dispute exists as to the
substance of what the employee said and did.  See, e.g.,
Horstkoetter v. Department of Pub. Safety, 159 F.3d 1265, 1270-71
(10th Cir. 1998); Brasslett v. Cota, 761 F.2d 827, 829 (1st Cir.
1985).  This is such a case.
 DeLucia cited four grounds for termination of the
practicum.  One was Everson's report that the appellant's behavior
during a discussion about abortion had frightened her.  The anti-
abortion sentiment expressed by the appellant during that tte--
tte clearly related to a subject of political controversy (and,
hence, public concern).  See Rankin, 483 U.S. at 386-87.
 DeLucia also cited the Family Fiesta Night and Regarding
Art incidents.  The appellant maintains that his expressive conduct
in both instances related, at least in some degree, to his views on
the public school curriculum.  This is a considerable stretch:  it
is almost certain that the appellant's conduct and comments at
those events were understood by his colleagues and others to
address his own personal beliefs rather than the content of the
curriculum.  Perhaps the most that can be said for the appellant's
position is that his refusal to participate in Family Fiesta Night
and his departure from (and contemporaneous remarks about) the
Regarding Art presentation constituted a veiled, indirect
expression of his disdain for the curriculum.  But that would not
be enough:  "the First Amendment protects only speech itself and
other expressive conduct that is 'intend[ed] to convey a
particularized message' under circumstances in which 'the
likelihood [i]s great that the message would be understood by
those'" to whom it was addressed.  Conward v. Cambridge Sch. Comm.,
171 F.3d 12, 22 (1st Cir. 1999) (quoting Spence v. Washington, 418
U.S. 405, 410-11 (1974) (per curiam)).  Still, the district court
determined this case on summary judgment and, under that appellant-
friendly standard, we are reluctant wholly to discount Hennessy's
suggestions that he intended to express principled disapproval of
the curriculum through his hegiras and that those in attendance
could reasonably be expected to discern the message.
 The curriculum connection is more apparent in respect to
the fourth incident   the appellant's confrontation with DeLucia.  
We glean from his concluding remarks condemning the curriculum that
at least some of what transpired during that session constituted a
comprehensible expression of his views on a matter of public
concern.
 Given this mixed bag   some clearly protected expression,
some less obviously so   we assume, favorably to the appellant,
that there is enough here to require a balancing of interests.  
From that point forward, the test is dynamic:  "the State's burden
in justifying a particular discharge varies depending upon the
nature of the employee's expression."  Connick, 461 U.S. at 150.  
As Justice Marshall phrased it, the expression should "not be
considered in a vacuum; the manner, time, and place of the
employee's expression are relevant, as is the context in which the
dispute arose."  Rankin, 483 U.S. at 388.  Also germane are
considerations such as "whether the statement impairs discipline by
superiors or harmony among co-workers, has a detrimental impact on
close working relationships . . . or impedes the performance of the
speaker's duties."  Id.  
 Against this backdrop, we have little difficulty
concluding that the school's strong interest in preserving a
collegial atmosphere, harmonious relations among teachers, and
respect for the curriculum while in the classroom outweighed the
appellant's interest in proselytizing for his chosen cause.  We
explain briefly.
 DeLucia received a report from Everson that the
appellant's demeanor while haranguing against abortion had
frightened her.  The appellant admits what was said but disputes
Everson's characterization of the nature of that conversation,
contending that it was amiable.  But the school was entitled,
within reasonable limits, to take Everson's report at face value
and give weight to her subjective reaction.  See Waters, 511 U.S.
at 676 (stating that, of necessity, public employers "often do rely
on hearsay, on past similar conduct, [and] on their personal
knowledge of people's credibility," and that such reliance, if
reasonable, does not contravene the First Amendment).  When a
school principal receives a report from an experienced teacher who
has no apparent axe to grind, we think that the principal can
credit the report (at least in the absence of any contrary
indication).  In all events, the principal here assigned
substantial import to Everson's account only after additional
problems involving the appellant surfaced.  This was both prudent
and constitutionally appropriate; a public employer has no
obligation to evaluate occurrences in isolation.  See Rankin, 483
U.S. at 388.
 Interaction between grade school teachers in neighboring
classrooms, especially those who share instructional
responsibilities, is an important consideration for school
administrators.  In such circumstances, the First Amendment does
not require a public employer to stand idly by when one employee's
expression engenders fear in a co-worker.  See Waters, 511 U.S. at
680 (admonishing that the First Amendment balance must take into
account the employer's strong interest in avoiding friction in the
work place); Givhan, 439 U.S. at 415 n.4 (similar).  We therefore
conclude, as a matter of law, that the appellant's statements to
Everson, while touching on matters of public concern, did not
outweigh the school's considerable interest as an employer in
guarding against the impairment of relations among teachers. See
Connick, 461 U.S. at 151-52 ("When close working relationships are
essential to fulfilling public responsibilities, a wide degree of
deference to the employer's judgment is appropriate.").
 We next consider the Family Fiesta Night and Regarding
Art incidents.  Giving the appellant the benefit of the doubt, see
supra, we treat his conduct and expressions of opprobrium as
involving matters of public concern (i.e., an intent to comment on
the public school curriculum).  Even so, Melrose's robust interest
in implementing the curriculum without undue interference easily
outweighs the appellant's interest in expressing himself at the
time and in the manner that he chose.  Where, as here, an
apprentice teacher elects a mode of communication   audible
denigration and visible petulance in the learning environment, in
front of students and others   that plainly conflicts with the
school's legitimate interest in requiring full participation in the
designated curriculum, the constitutional balance tips sharply in
the employer's favor.  Cf. Hochstadt v. Worcester Found. for Exp'l
Biology, 545 F.2d 222, 233 (1st Cir. 1976) (holding that disruptive
employee "went beyond the scope of protected opposition" in light
of employer's interest in "maintaining a harmonious and congenial
working environment").
 Much the same is true in respect to the appellant's
comments about the art presentation and his abrupt departure from
that activity.  Within the hearing of both parents and pupils, the
appellant called the exhibition "disgusting" and the Cesaro
painting "obscene" before leaving in the middle of class.  By
choosing these means of expression, the appellant undermined the
presentation and neglected his own responsibilities as an
apprentice teacher.  He capped this neglect by failing to return in
time to conduct a previously scheduled class.  Any protectable
interest that he may have had in expressing his displeasure with
the school's curriculum did not match Melrose's interest in
preventing interference with its educational mission.  See Rankin,
483 U.S. at 388; Connick, 461 U.S. at 152.
 The appellant's comments to the principal fare no better.  
By the appellant's own account, DeLucia attempted to persuade him
that his behavior in connection with Family Fiesta Night and
Regarding Art was unprofessional.  The appellant rejected this
characterization, challenged the propriety of permitting such
activities to occur in the public schools, and remained adamant
about the moral correctness of his position.
 The First Amendment notwithstanding, a supervisor is
entitled to a modicum of respect and decorum in work-related
situations.  Here, although the appellant's remarks related in part
to the curriculum (a matter of admitted public concern), they
simultaneously evinced a level of intransigence and insubordination
that no employer should be compelled to tolerate.  See Connick, 461
U.S. at 154.  Moreover, the appellant exacerbated the situation by
challenging DeLucia's authority over him and, by extension, her
authority over the curriculum.  Nothing about the appellant's
limited First Amendment interest required the principal to condone
actions that she reasonably thought would subvert her hegemony and
injure her ability to supervise personnel in the workplace.
 The successful operation of an elementary school requires
the person in charge to be in charge and to maintain close working
relationships with each of her teachers.  Cf. Connick, 461 U.S. at
151.  Part and parcel of that relationship is the principal's
responsibility to oversee teachers' in-class conduct.  When a
teacher rejects constructive criticism, vilifies the principal, and
openly challenges her power to set ground rules for professional
conduct, that teacher jeopardizes the successful and efficient
operation of the institution.  See Givhan, 439 U.S. at 415 n.4.  
The Melrose defendants' strong interest in avoiding this
potentiality overbalanced any interest that the appellant may have
had in conveying his thoughts on the public school curriculum at
that time and in that manner.  See Connick, 461 U.S. at 152.
 The appellant has a fallback position.  He says that, at
a bare minimum, certain facts were controverted and that the
existence of these disputes precluded summary judgment.  We have
canvassed the record carefully and have confirmed that factual
disputes do exist (e.g., the appellant claims that when he stormed
out of the Regarding Art activity, he repaired to the school's
computer room to work on a tutorial assignment, whereas the
defendants claim that he left the premises; the appellant also
denies that he called DeLucia "the devil" to her face, whereas she
insists that he did).  The flaw in the appellant's position,
however, is that factual disputes, in and of themselves, do not
forestall summary judgment; to accomplish that end, the disputes
must involve material facts.  See Nereida-Gonzalez v. Tirado-
Delgado, 990 F.2d 701, 703 (1st Cir. 1993); Medina-Munoz v. R.J.
Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).  Here, the
material facts   what the appellant said and did during the
Everson, Family Fiesta Night, and Regarding Art incidents, and what
he said when DeLucia called him onto the carpet   are mostly
admitted (although the appellant strains to put a more favorable
spin on them), and the few details that are controverted do not
alter the decisional calculus.  The First Amendment issue was,
therefore, ripe for brevis disposition.
 We close this portion of our opinion by repeating what
Justice Powell wrote a quarter-century ago:  "The Government, as an
employer, must have wide discretion and control over the management
of its personnel and internal affairs.  This includes the
prerogative to remove employees whose conduct hinders efficient
operation and to do so with dispatch."  Arnett v. Kennedy, 416 U.S.
134, 168 (1974) (Powell, J., concurring).  This tenet remains
valid, and this case   in which the Melrose defendants' stated
concern over the serial incidents involving the appellant had
nothing to do with the content of the appellant's statements, and
everything to do with the time, place, and manner in which he
communicated his sentiments   comes within its heartland.  Hence,
the lower court did not err in granting summary judgment on the
First Amendment claim.
                   B.  The Due Process Claim.
 The appellant claims that Salem State failed to accord
him both procedural and substantive due process when it removed him
from the teacher certification program.  "The requirements of
procedural due process apply only to the deprivation of interests
encompassed by the Fourteenth Amendment's protection of liberty and
property."  Board of Regents v. Roth, 408 U.S. 564, 569 (1972).  In
an effort to satisfy this criterion, the appellant classifies Salem
State's denial of an opportunity to obtain certification through
its program as a deprivation of a constitutionally protected
property interest, presumably one deriving from an implied
contractual right to continue in that program.
 The theoretical underpinnings of this gambit are shaky.  
The Supreme Court has not yet decided whether a student at a state
university has a constitutionally protected property interest in
continued enrollment.  See Regents of Univ. of Mich. v. Ewing, 474
U.S. 214, 223 (1985) (assuming the existence of such an interest,
but leaving the question open); Board of Curators v. Horowitz, 435
U.S. 78, 84-85 (1978) (same).  In any case, the claim to such a
property interest is dubious, see Ewing, 474 U.S. at 229 (Powell,
J., concurring), and in this case it seems especially tenuous
because Salem State did not expel the appellant, but merely
precluded him from continuing in a particular program.  In an
abundance of caution, however, we assume for argument's sake that
the appellant possessed a constitutionally protected property
interest in completing the teacher certification program.
 On this assumption, we turn next to the question of what
process is due.  Although that determination is context contingent,
there are some overall benchmarks.  A hearing   or the offer of one
 usually is necessary when a school takes serious disciplinary
action against a student.  See Goss v. Lopez, 419 U.S. 565, 579
(1975).  By contrast, academic sanctions customarily are left to
academic channels and do not require a hearing as a matter of
constitutional right.  See Horowitz, 435 U.S. at 90; see generally
Dixon v. Alabama State Bd. of Educ., 294 F.2d 150, 158-59 (5th Cir.
1961) (contrasting dismissal for misconduct, which requires a
hearing, with academic dismissal, which does not).  The threshold
step, then, is to classify Salem State's action as "disciplinary"
or "academic."
 When Salem State removed the appellant from the
certification program, it advanced two reasons:  (1) he received a
failing grade in his practicum, and (2) he had not satisfied four
of the common teaching competencies required for certification by
the MDOE.  On the surface, these reasons seem quintessentially
scholastic, but the appellant complains that they were merely a
pretext for disciplinary action.  He relies principally on two
props to support this allegation.
 First, the appellant calls our attention to the excellent
grades he had received in his course work up until the second
semester of his senior year.  Proficiency in course work, however,
is only one component of the certification process.  The practicum
constitutes a completely separate component.  Thus, the fact that
the appellant had good grades is only marginally relevant.  Cf.
Horowitz, 435 U.S. at 95 (Powell, J., concurring) (noting that the
plaintiff was dismissed from medical school "because she was as
deficient in her clinical work as she was proficient in the 'book-
learning' portion of the curriculum").
 To be sure, the appellant received some positive reviews
from Dr. Mangini during the early stages of his practicum.  That
datum, however, fails to negate the inescapable fact that DeLucia
eventually dismissed him from the practicum, the successful
completion of which was a prerequisite to certification.  Given
that dismissal, it is surpassingly difficult to see how Salem
State, from a purely academic standpoint, could have recommended
the appellant for certification.  And because the approved
methodology for assessing the teaching competencies, set by the
MDOE, explicitly requires the certifying institution to evaluate a
fledgling teacher's interpersonal skills, the appellant's inability
to communicate effectively with his colleagues at Horace Mann and
his unwillingness to work within the prescribed curriculum
reasonably could have as much influence on Salem State from an
academic standpoint as, say, his ability to prepare a lesson plan.  
Cf. id. at 91 n.6 (concluding that factors such as "[p]ersonal
hygiene and timeliness may be as important . . . in a school's
determination of whether a student will make a good medical doctor
as the student's ability to take a case history or diagnose an
illness").
 Nor does the virtual certainty that the Salem State
faculty considered the appellant's problems at Horace Mann when
adjudging his performance "incomplete" and assigning him failing
grades in various teacher competencies transform its academic
decision into a disciplinary one.  In this regard, the appellant
complains that the reasons DeLucia gave for terminating the
practicum involved his conduct, not his competence, and thus were
disciplinary in nature.  This complaint is groundless.  The
appellant's conduct at Horace Mann had academic significance
because it spoke volumes about his capacity to function
professionally in a public school setting.  Bearing this in mind,
we find no factual information of a significantly probative nature
that suggests that Salem State's decision to fail the appellant
rested on anything other than the faculty's academic judgment that
he had neither completed the required assignments nor demonstrated
the practical qualities necessary to perform efficaciously as a
public school teacher.  Although this judgment by its nature had a
subjective cast, it nonetheless fell well within the sphere of
constitutionally permissible academic decisionmaking.  See id. at
90.
 The appellant's second basis for contending that Salem
State's decision was pretextual springs from the chronology of
events.  He argues that Salem State initially suspended him for
misconduct and only asserted academic grounds for denying him
certification after circumstances stymied its pursuit of
disciplinary charges.  The appellant correctly recites the timing
of these two events, but "one plus one does not equal three," and
a causal connection is not necessarily established by a temporal
link.  Blackie v. Maine, 75 F.3d 716, 723 (1st Cir. 1996).  Here,
the temporal sequence simply will not bear the weight that the
appellant piles upon it.
 The mere fact that the appellant's conduct carried both
disciplinary and academic implications does not, without more,
transform the character of Salem State's action or support the
inference that the college used its academic decisionmaking power
as a back door to achieve disciplinary goals.  The appellant's
argument in opposition conveniently overlooks Salem State's
documented concerns, predating his placement at Horace Mann, about
his ability to function in a public school setting.  The argument
also overlooks the undeniable fact that Salem State at some point
had to make an academic judgment with respect to his practice
teaching and the required competencies.  The appellant's bald
allegation does not suffice to create a genuine issue of material
fact as to whether Salem State resolved these points adversely to
the appellant simply as a means of imposing a disciplinary or
quasi-disciplinary sanction.  See, e.g., Cadle, 116 F.3d at 960
(explaining that "establishing a genuine issue of material fact
requires more than effusive rhetoric and optimistic surmise");
Medina-Munoz, 896 F.2d at 8 (holding that one opposing summary
judgment cannot rely simply on "conclusory allegations" or
"unsupported speculation"); see also Williams v. Cerberonics, Inc.,
871 F.2d 452, 457 (4th Cir. 1989) (holding that pretextual reason
for firing employee is not established by mere allegation).
 That ends the matter.  Because the appellant has not
placed in legitimate doubt the academic nature of Salem State's
decision to remove him from the teacher certification program, his
claim that some more elaborate process should have been accorded as
a matter of constitutional right before reaching that decision
fails.  The purpose behind the constitutional requirement that a
student should be offered the opportunity to be heard in regard to
disciplinary determinations lies in the resemblance that such
determinations bear to "traditional judicial and administrative
factfinding."  Horowitz, 435 U.S. at 88-89.  Because those
considerations do not obtain in respect to academic determinations,
the Constitution typically does not require a hearing in connection
with the imposition of academic sanctions.  See id. at 90
(declining "to ignore the historic judgment of educators and
thereby formalize the academic dismissal process by requiring a
hearing"); Wheeler v. Miller, 168 F.3d 241, 248 (5th Cir. 1999)
(holding that due process did not require a hearing for
academically-based dismissal of student); Clements v. County of
Nassau, 835 F.2d 1000, 1006 (2d Cir. 1987) (similar); Mauriello v.
University of Med. & Dent., 781 F.2d 46, 49 (3d Cir. 1986)
(similar); Ikpeazu v. University of Neb., 775 F.2d 250, 254 (8th
Cir. 1985) (similar); cf. Disesa v. St. Louis Comm. Coll., 79 F.3d
92, 95 (8th Cir. 1996) (stating that lower court exceeded due
process requirements by requiring a hearing prior to academic
dismissal).  Indeed, judicial intrusion of this kind into the
academic community could do irreparable harm to the traditional
faculty-student relationship.  See Horowitz, 435 U.S. at 90; see
also Epperson v. Arkansas, 393 U.S. 97, 104 (1968) (cautioning
against unwarranted "[j]udicial interposition in the operation of
the public school system").  We hold, therefore, that the appellant
was not constitutionally entitled to a hearing regarding his
removal, for academic reasons, from the teacher certification
program.
 We touch one related base.  To the extent that the
appellant seeks to assert a substantive due process claim, he has
adduced no evidence from which we could infer that Salem State's
decision was "beyond the pale of reasoned academic decisionmaking."  
Ewing, 474 U.S. at 227-28.  Although Salem State could have opted
for a different course (e.g., it might have tried to transfer
Hennessy to another elementary school to finish his practicum), the
course it chose was a reasonable solution to a vexing set of
circumstances.  In the usual case, courts should leave such
judgment calls to the academicians   and this case falls
comfortably within the mine-run.  See, e.g., Wheeler, 168 F.3d at
248; Disesa, 79 F.3d at 95; Clements, 835 F.2d at 1006; Mauriello,
781 F.2d at 49; Ikpeazu, 775 F.2d at 254.
III.  CONCLUSION
 We need go no further.  Because the district court
appropriately granted the defendants' motions for summary judgment,
its order will be

Affirmed.

</body>

</html>